[No. S070327. Mar. 27, 2008.]

THE PEOPLE, Plaintiff and Respondent, v.
ANDRE GERALD WILSON, Defendant and Appellant.

2

**COUNSEL**

Michael J. Hersek, State Public Defender, under appointment by the Supreme Court, and Evan Young, Deputy State Public Defender, for Defendant and Appellant.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Sharlene Honnaka and Xiomara Costello, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**CHIN, J.**—A jury convicted defendant Andre Gerald Wilson of the first degree murder and attempted robbery of Sary San, and found the robbery-murder special-circumstance allegation to be true. (Pen. Code,[1] §§ 187, subd. (a), 664, 211, 190.2, subd. (a)(17).) It also found true the allegation that defendant personally used a firearm, i.e., a handgun, in committing these offenses. (§§ 1203.06, subd. (a)(1), 12022.5, subd. (a).) After the penalty phase, the jury returned a verdict of death.

The trial court denied defendant's motions for new guilt and penalty phase trials (§ 1181), along with his automatic application for modification of the

---

[1] Further statutory references are to the Penal Code unless otherwise noted.

verdict (§ 190.4, subd. (e)), and sentenced him to death. This appeal is automatic. (Cal. Const., art. VI, § 11; § 1239, subd. (b).)

For reasons that follow, we affirm the judgment.

## I. Factual and Procedural Background

### A. Guilt Phase

#### 1. Overview

On July 25, 1996, her first day as cashier at Seng Heng Market, victim Sary San was shot and killed during an attempted robbery. The fatal shooting was captured by the market's surveillance cameras, which recorded both picture and sound. While the videotape did not conclusively establish defendant as the gunman, prosecution witness Shanta Sadewater testified that on that day she drove defendant to Seng Heng Market, which she claimed defendant had planned to rob.[2] The videotape revealed that before San had a chance to open the cash register, the suspect shot her in the back of the head at pointblank range. The defense position, supported by defendant's own testimony, was that defendant was not the gunman, and that Sadewater was involved in the crime. The defense suggested that the gunman was Sadewater's boyfriend, Jacoby Alexander, who died shortly after the crime.

#### 2. Prosecution Evidence

Sadewater recounted the facts leading up to the crime. On July 25, 1996, the day of the fatal shooting, defendant accompanied Sadewater and her friend, Rene Grant, to a blood bank where Sadewater and Grant gave blood. Defendant was wearing a green long-sleeved shirt and a floppy fisherman-style hat. On the way to the blood bank, Sadewater returned to defendant a loaded four-barrel handgun, which he had given her about a week before to clean. Defendant told Sadewater that he and a friend named "Twin" planned to rob a drug dealer named Reggie. Defendant placed the gun in the waistband of his pants.

After giving blood, Grant dropped off Sadewater and defendant at the home of Casana Walker, Sadewater's friend and neighbor, so that Sadewater

---

[2] Initially charged as a codefendant, Sadewater was prosecuted for first degree murder with a special circumstance and attempted robbery, and faced a sentence of life in prison without the possibility of parole for her role in these events. In a separate trial, which occurred before defendant's, a jury convicted Sadewater of being an accessory after the fact and attempted robbery, but acquitted her of murder. Although the trial judge was inclined to sentence her to the midterm of two years, the same deputy district attorney prosecuting defendant convinced the judge to sentence Sadewater to the maximum term of three years.

could borrow Walker's car, a blue Oldsmobile Firenza. Sadewater had agreed to give defendant a ride to meet Twin. While defendant waited for a page from Twin, Sadewater and defendant drove around Long Beach for several hours, during which time they stopped at Seng Heng Market. Sadewater went in and asked if they sold a particular type of cigarettes. When she returned to the car, defendant asked her if she would "hit that store," which she took to mean, rob the store. She said she would not. Sadewater and defendant left and continued to drive around. Shortly before 5:00 p.m., Sadewater and defendant returned to the vicinity of Seng Heng Market. Defendant asked Sadewater to pull over because he was "going to go check for himself," which meant he wanted to see if it was a good place to rob.

The market's security guard, David Repp, testified about the events in the market, though he was unable to identify the gunman. Repp testified that the suspect came into the market, grabbed a soda from the cooler, and walked up to the register. San, who had begun her first day of work at the market, was at the cash register. The videotape revealed that the suspect pulled the handgun from his waistband, reached over the counter and pointed it at San's head. He demanded, "Open the register." As San leaned back, the suspect walked around the counter with the gun pointed at San's head and repeatedly demanded that she open the register. Standing right behind her, the gunman again demanded that she "open it." Before San was able to open the register, the suspect pushed her towards the counter and tried unsuccessfully to open the register himself. The suspect dragged San by the hair and pushed her head onto the counter. After looking around the market, he fired into the back of San's head and ran off. San fell and hit her head on the floor, where she remained motionless. Blood was splattered on the white counter and on the floor by her head. San died from a single gunshot wound to the head. Most of her skull had been blown away by the gunshot at pointblank range.

Repp testified that as the gunman ran out of the market, the gunman's hat fell off. Repp, who had his gun drawn during the shooting, pursued him. As the gunman got into the passenger side of the blue Oldsmobile, he shot twice at Repp. Repp returned fire with 12 shots, one of which went through the windshield; several hit the side of the car. The gunman fled the scene in the car. Repp testified he was "positive" that the man he saw shoot San was the same one getting into the car.

Sadewater testified that she was waiting for defendant, with the car engine running. After gunshots hit the car, she tried to move it while defendant was getting in. Sadewater told him she did not think it was a good idea to rob the market. Defendant said he had shot someone, whom Sadewater believed to be the security guard. Sadewater continued driving and eventually arrived near the Wardlow train station in Long Beach when the car stalled. After

moving the car into an empty parking space, they abandoned it. Defendant told Sadewater to gather the items he left in the car—the gun, box of ammunition, rubber gloves he wore, and stocking he had put over his head—which she placed in her purse. The duo took a train to the home of defendant's father, John Wilson, where defendant shaved and changed out of his green shirt. Defendant and Sadewater left John Wilson's place and walked to Sadewater's apartment. Defendant stayed at Sadewater's apartment for a few hours and returned to his apartment.

That day, Walker called Sadewater several times about her car. Based on a previously agreed-upon story with defendant, Sadewater lied to Walker, telling her that a "group of Mexicans" shot up Walker's car. In a subsequent telephone conversation with defendant, Sadewater told him Walker was going to report her car stolen, at which point he told her to "go and wipe the car down" to get rid of any fingerprints. Sadewater went back to the car and cleaned the car with oil from her gun kit. When Sadewater returned and called Walker, she found out Walker had gone to the police department.

In the early morning of July 26, the day after the murder, police arrested Sadewater at her apartment. Detective Roy Hamand interviewed her at the police station. When Detective Hamand told Sadewater she was going to be charged with aiding and abetting a murder, she thought the police were lying because she believed the shooting victim was the security guard, whom she saw standing when they fled. She lied, stating that Mexicans shot at defendant and her and their car. After Detective Hamand told her that a cashier had been shot in the head after she could not open the cash register, Sadewater told them what actually happened. In a recorded conversation, she told police everything she remembered.

Sadewater helped police retrieve the gun used in the shooting and directed them to a dumpster where she had disposed of the bullet casings, box of ammunition, rubber gloves, and stocking. She also took police to defendant's father's house, where they recovered the green shirt the suspect wore during the murder. The hat the suspect wore and dropped at the murder scene was also later recovered. Defendant's thumbprint was found on a plastic bullet holder contained in the box of ammunition. Several witnesses identified the green shirt as the one the suspect wore, defendant acknowledged that the green shirt and hat once belonged to him, and security guard Repp recognized the hat.

Defendant fled to Oakland after the killing. Over five months later, on January 13, 1997, a multiagency fugitive task force located defendant in the attic of an Oakland home. Defendant initially refused to surrender. When he was eventually arrested, defendant was armed with two shank-type knives

with six- to eight-inch-long metal blades. Defendant first gave officers a false name, but eventually admitted his identity and said that he was aware he was wanted in connection with a Long Beach murder.

### 3. *Defense Evidence*

Sothanary Som, an owner of Seng Heng Market, testified that shortly before 5:00 p.m. on the day of the murder, a man rode up to the market on a bicycle. He first asked for cigarettes and then walked to the cooler and grabbed a drink. As he walked up to the cashier, Som saw the man remove a gun from his pocket, at which point she hid behind a box. She heard the assailant demand of the cashier, "Open the register. Give me the money." Although she did not see the shooting or the assailant's face, Som believed the man on the bicycle was the same one who fatally shot San. She described the man as wearing blue jeans and black clothing, which was inconsistent with other descriptions of the assailant. Several days after the crime occurred, Som gave detectives a written statement indicating she was "70 percent sure" that she identified the correct assailant in the photographic lineup they showed her. Som admitted that by the time of trial, she had only a vague recollection of what had happened that day.

Defendant testified on his own behalf. Refuting much of Sadewater's version of the day's events, defendant denied entering Seng Heng Market, denied trying to rob the market, and denied shooting San. Instead, he gave an account of the day's events, suggesting Sadewater's boyfriend, Jacoby Alexander, fatally shot San.

According to defendant, that morning he gave Sadewater and Alexander a bag of clothes, which included the green long-sleeved shirt and hat worn by the murderer. He gave the clothes away because they no longer fit him. In the afternoon, defendant accompanied Sadewater and her friend, Rene Grant, to the blood bank, where Alexander later met them wearing the green shirt defendant had given away that morning.

Sadewater told defendant that she, Alexander, and Alexander's friend were going to rob someone, and asked if defendant wanted to participate. Defendant said no and took a bus to go home. He later saw the group near the Wardlow station, where they "looked kind of hysterical, like they was on some drugs." Shortly thereafter, Sadewater returned the green shirt to defendant because she no longer needed it. After Sadewater left, defendant, who was not wearing a shirt, put on that green shirt and left for his father's house. As he walked, defendant met Sadewater again. She said, "That's the shirt that the Mexicans was shooting at us." Defendant "felt fear" based on what Sadewater told him, and changed into another shirt when he got to his father's house.

When questioned about Twin on the witness stand, defendant denied knowing any "twins" and also denied knowing someone named Reggie, the person whom Sadewater testified defendant and Twin were going to rob. Defendant also denied possessing the handgun Sadewater testified she had returned to him on the day of the murder. Defendant claimed he saw the murder weapon at Sadewater's house and admitted touching the bullet holder and bullets one week before the murder. Two days after the murder, defendant fled to Oakland because he "didn't want to be mixed up in any type of gang violence." He said he also left because Sadewater was going to blame him for what happened to Walker's car. When he arrived in Oakland, defendant called his grandmother to tell her he was going to move out, so she did not have to pay rent on his apartment, which she often did. About a week after the murder, defendant learned he was featured on the television show, *America's Most Wanted.* He did not turn himself in, however, because he believed officers had a warrant authorizing them to "shoot to kill." He was afraid officers would shoot him before allowing him to tell his side of the story.

### 4. *Rebuttal Evidence*

In rebuttal, prosecution witness Detective Hamand testified that, to his knowledge, there is no such thing as a "shoot to kill" warrant in the United States. He explained that Alexander, who had been in police custody, was later released based on information he received from Sadewater and on his own determination that Alexander was not the male suspect captured on the surveillance videotape. Unlike the suspect on the videotape, who was thin, Alexander was "buff" and had a wide neck. Detective Parine Soth testified they detained Alexander, along with Sadewater, because they did not know Alexander's identity and did not know if he was involved in the murder.

### B. *Penalty Phase*

#### 1. *Prosecution Evidence*

The prosecution presented victim impact evidence through the testimony of San's mother, San's husband, and their oldest child. Say Prak, San's mother, testified first about San's family background. San was the third of 11 children born to Prak and her husband. San met her husband, Nay Meas, in Cambodia. After the two families moved to a refugee camp in Thailand, where they resided for several years, they moved first to Arkansas, then to Alabama, and later to Long Beach in 1988.

San and Meas had seven children. Meas testified he was "shocked" and "scared" at the news of San's death. Although he followed the ambulance to the hospital, she had died by the time he arrived. San worked while Meas

took care of the children and took them to school. Meas told the children individually of their mother's death, with the oldest ones taking the news the hardest. He had trouble describing how he felt about San's death except to say he felt "very lost right now."

San's eldest child, daughter Synath Meas, spoke last. San's death was very hard on Synath, who was now responsible for watching her younger siblings and had assumed her mother's role. After Synath was too overcome with emotion to read a letter she had written to her mother, a victims' witness advocate read the letter to the jury. A home video of San with her children at a birthday party was played for the jury.

### 2. *Defense Evidence*

Defendant's maternal grandmother, Barbara Wolfe, testified about defendant's upbringing. Defendant's father, John Wilson, had been physically abusive to defendant's mother, Vickie Nicholson, who eventually moved out with her three sons and lived with Wolfe for a year. From that point, Wilson was an absentee father and had no contact with defendant or his two younger brothers. In the seventh grade, defendant moved in with Wolfe, who learned that he suffered from a reading disability. Defendant returned to live with his mother and her fiancé during high school. His mother's fiancé was physically abusive to her, on one occasion holding a gun to her head and on another breaking her nose. In 1990, he stabbed Vickie to death, and defendant and his two brothers were found standing over her body.

After his mother's death, defendant apparently converted to Islam and stayed with his Muslim friends. He was quiet, and spent his time studying and reading. Defendant's two brothers frequently got in trouble after their mother's death. At the time of defendant's penalty trial, both were in prison. Wolfe also testified that when she was diagnosed with cancer, defendant often visited her and "was there for" her, unlike her other grandchildren.

Defendant had three children, one boy and two girls, by three different women. The oldest was five years old and the youngest was almost two. Defendant's aunt, Marcelyn Lloyd, testified that defendant was attentive to his children and never "whooped" them, though Lloyd believed defendant's mother had been somewhat abusive to defendant and his brothers. Lloyd's son, Duane Nicholson, who was defendant's classmate, testified that defendant has "always been there for me. . . . [H]e's two years older than me, so he's always been my protector because I wasn't streetwise."

Members of a nonprofit art studio, where defendant participated in a program for at-risk youth, testified he was good with children. The art

director, Dr. Akinsanya Kambon, testified defendant was an "asset" to the program and possessed "very good" artistic skills. After his mother's death, defendant began drawing a mural of a house with an open door and blood inside, but did not complete it. The executive director, Tamasha Ross, was impressed by defendant's artistic skill, his dedication to the program, and his attentiveness as a young father.

Psychologist Dr. Harry Taylor testified on defendant's behalf. Dr. Taylor, who spent a total of 10 hours with defendant, administered a battery of tests to him. Dr. Taylor also reviewed an approximately two-inch stack of police reports and background information on defendant.

Dr. Taylor opined that defendant suffered from dysthymia, which he described as a "depressive demeanor, depressive attitude." While defendant's depression was not "incapacitating" or "impairing," it had existed for a period of time. The Minnesota Multiphasic Personality Inventory-2 test revealed defendant's lack of confidence, his feelings of failure, and his interpersonal difficulties, irritability, negativity and poor judgment. Dr. Taylor believed defendant had a "character disorder with anti-social traits . . . [and] schizoid features." Although defendant often withdrew from people, he was "not an individual who has psychotic-like proclivities or tendencies, he is not out of touch with reality." Defendant was not schizophrenic. He had a history of substance abuse, which included cocaine, marijuana and alcohol.

Based on defendant's family background, i.e., losing his mother, having children by different women, not having his father in his life, Dr. Taylor opined that defendant possessed "a whole reservoir of anger that is re-pressed." Dr. Taylor made "a reasonable assumption from the dynamic point of view that the once victim is now moving toward the perpetrator role and the cycle of violence is occurring." Defendant told Dr. Taylor his father physically abused his mother, although defendant did not specifically recall the domestic abuse. Without the support of his parents, defendant suffered from low self-esteem.

As for defendant's academic abilities, Dr. Taylor testified that defendant's IQ was 83, which is in the low-average range, and that he suffered from a learning disability in the areas of reading and spelling. Defendant, however, was able to learn new material at an average level and had an average ability to size up a social situation. During elementary school, defendant was not considered a behavioral problem, though he did have academic difficulties. In junior high, defendant did satisfactorily in school. Defendant's problems with the law began in high school when he was about 16 years old. Dr. Taylor suspected defendant had gang affiliations based on the area in which he lived, but he did not believe defendant was "entrenched" in gang life.

On cross-examination, Dr. Taylor testified that in his 20-page report on this case, he wrote the following: "As the defendant talked about the instant offense, his candor was questionable." His report also revealed that defendant's profile "suggests that the individual has a preference for action and is inclined to act out." He also reported that defendant denied any past psychological trauma or child abuse. However, defendant had told a defense investigator that someone had attempted to molest him, but he had been able to "fight the guy off."

When Dr. Taylor viewed the videotape of the murder in court, he affirmed that the crime was the kind of "acting out" he described in his written report. However, when the prosecutor asked Dr. Taylor if defendant's daylong planning to commit a robbery reflected an impulsive act, he replied: "In that particular situation, that type of planning is not impulsive."

## II. DISCUSSION

### A. *Pretrial Phase—Denial of Challenges for Cause*

During jury selection, defendant challenged for cause two prospective jurors because their statements assertedly revealed a bias in favor of the death penalty. After the trial court denied these challenges, defendant exercised two peremptory challenges against these prospective jurors when they were called as prospective alternates. Defendant exhausted his peremptory challenges during the selection of alternate jurors, but did not object to the final composition of the jury. On appeal, he claims that he was compelled to use his peremptory challenges on two prospective jurors who should have been dismissed for cause, which effectively gave the prosecution two additional peremptory challenges. Defendant asserts the trial court's actions "artificially created a death prone jury," which violated his due process rights and undermined the reliability of the verdict. (U.S. Const., 6th, 8th & 14th Amends.; Cal. Const., art. I, §§ 7, 15.)[3]

---

[3] As to this and nearly every claim on appeal, defendant asserts the alleged error violated his constitutional rights. At trial, he failed to raise some or all of the constitutional arguments he now advances. "In each instance, unless otherwise indicated, it appears that either (1) the appellate claim is of a kind (e.g., failure to instruct sua sponte; erroneous instruction affecting defendant's substantial rights) that required no trial court action by the defendant to preserve it, or (2) the new arguments do not invoke facts or legal standards different from those the trial court itself was asked to apply, but merely assert that the trial court's act or omission, insofar as wrong for the reasons actually presented to that court, had the additional *legal consequence* of violating the Constitution. To that extent, defendant's new constitutional arguments are not forfeited on appeal. [Citations.] [¶] In the latter instance, of course, rejection, on the merits, of a claim that the trial court erred on the issue actually before that court necessarily leads to rejection of the newly applied constitutional 'gloss' as well. No separate constitutional

■ Defendant's claim based on the trial court's denial of his challenges for cause is not cognizable on appeal. (See *People v. Beames* (2007) 40 Cal.4th 907, 924 [55 Cal.Rptr.3d 865, 153 P.3d 955]; see also *People v. Avila* (2006) 38 Cal.4th 491, 539 [43 Cal.Rptr.3d 1, 133 P.3d 1076].) Here, although exhausting his peremptory challenges to remove the two jurors in question, defendant did not object to the jury as finally constituted; thus, he has forfeited the claim. Moreover, contrary to his contention, the loss of peremptory challenges does not implicate his constitutional right to an impartial jury. (See *Ross v. Oklahoma* (1988) 487 U.S. 81, 88 [101 L.Ed.2d 80, 108 S.Ct. 2273]; *People v. Avila, supra*, 38 Cal.4th at p. 540; see also *People v. Boyette* (2002) 29 Cal.4th 381, 419 [127 Cal.Rptr.2d 544, 58 P.3d 391].)[4]

■ In any event, we find no error. A trial court may excuse for cause a juror whose views on the death penalty "would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " (*Wainwright v. Witt* (1985) 469 U.S. 412, 424 [83 L.Ed.2d 841, 105 S.Ct. 844]; see *People v. Hoyos* (2007) 41 Cal.4th 872, 905 [63 Cal.Rptr.3d 1, 162 P.3d 528].) "The trial court's determination of the juror's state of mind is binding on appeal if the juror's statements are equivocal or conflicting. If the juror's statements are not inconsistent, we will uphold the court's ruling if it is supported by substantial evidence. [Citation.]" (*People v. Harrison* (2005) 35 Cal.4th 208, 227 [25 Cal.Rptr.3d 224, 106 P.3d 895].)

On her juror questionnaire, Prospective Juror No. 3131 answered she was "strongly in favor" of the death penalty: "I believe that if a person willfully murders someone (and it isn't self-defense) that person should receive the death penalty if convicted." She added: "It is the ultimate pay back for their crime. If they take a life, they must give their own." However, several of her written responses indicated she would need to know "all the circumstances" before she could strongly agree that someone should receive the death penalty; she would not automatically vote for death in every case regardless of the evidence. During voir dire, Prospective Juror No. 3131 confirmed several of her questionnaire responses, including her statement that a defendant who kills someone during a robbery should receive only the death

discussion is required in such cases, and we therefore provide none." (*People v. Boyer* (2006) 38 Cal.4th 412, 441, fn. 17 [42 Cal.Rptr.3d 677, 133 P.3d 581].)

[4] Defendant asserts that because he was forced to use his peremptory challenges on these two jurors, he could not challenge an alternate juror, Juror No. 0046, who was eventually seated following the dismissal of a seated juror. In expressing concerns about the juror's views, defendant claims "[t]here is nothing in the record to indicate that [defendant] was satisfied with" the alternate juror. This is not enough. "To the extent defendant now suggests he was unhappy with the composition of the jury, his 'belated recitation of dissatisfaction with the jury is speculative. Consequently, he fails to demonstrate that he was harmed by the denial of his challenges for cause.' [Citation.]" (*People v. Boyette, supra*, 29 Cal.4th at p. 419.)

penalty. She qualified that she "would really have to hear everything first. That is a general statement. I think there's—you know, everything has circumstances, but generally that's how I feel." She affirmed her understanding that "the aggravating circumstances would outweigh the mitigating circumstances," in order to impose the death penalty. She repeatedly stated that her decision on the death penalty would depend on the particular circumstances of the case, and also revealed she would be openminded about voting for a sentence of life without parole. In denying defendant's challenge for cause, the trial court found that while this prospective juror "appears to strongly favor the death penalty, . . . she also appears to be open to consideration of life without the possibility of parole." The court noted the juror also "indicated that she would carefully weigh and consider factors in aggravation and mitigation," and that the robbery-murder circumstance would not be the only factor she would consider.

During voir dire, Prospective Juror No. 4215 reaffirmed his questionnaire statement that he was "strongly in favor of the death penalty." However, he indicated he would not automatically vote for the death penalty in every case regardless of the evidence. He "strongly agree[d]" that a defendant who kills during the course of a robbery should receive the death penalty; however, he indicated he would listen to all the evidence and to what other jurors had to say about the punishment. Prospective Juror No. 4215 also revealed his disdain for defense attorneys, who "don't care about justice or right or wrong or victims," but claimed he could put aside any bias. The trial court denied defendant's challenge for cause based on the following: Despite this juror's disdain for defense attorneys, he and other jurors in an unrelated case acquitted the defendant based on the evidence; the juror indicated he would listen to and base his decision on the evidence, including aggravating and mitigating factors; although he did not foresee himself as a holdout juror against the death penalty, he would be willing to change his mind if other jurors were to persuade him to prevent a hung jury.

Based on our review of the record, we conclude that the statements of these two prospective jurors were not inconsistent and that the trial court's determination of the jurors' states of mind is supported by substantial evidence. (See *People v. Harrison, supra,* 35 Cal.4th at p. 227.) While both prospective jurors strongly favored the death penalty, both consistently stated that they would not automatically vote for death in every case but would consider all the evidence (including aggravating and mitigating circumstances), and would base their penalty decision on the particular facts of the case. Both prospective jurors also indicated they were open to voting for a sentence of life without the possibility of parole.

B. *Guilt Phase*

1. *Failure to Instruct on Lesser Included Offenses*

The trial court instructed the jury on murder, first degree felony murder, and robbery-murder special circumstance. (CALJIC Nos. 8.10, 8.21, 8.81.17.) It did not instruct on second degree murder or first degree premeditated murder; the parties agreed the court need not do so. On appeal, defendant contends the trial court erred in failing to instruct on lesser included offenses, in violation of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

As the Attorney General concedes, defendant's agreement that the court need not instruct on second degree murder or first degree premeditated murder was not invited error because defense counsel did not "express[] a deliberate tactical purpose in resisting or acceding to the complained-of instruction." (*People v. Valdez* (2004) 32 Cal.4th 73, 115 [8 Cal.Rptr.3d 271, 82 P.3d 296].) In any event, we conclude the trial court made no instructional error because, on these facts, it was not obligated to instruct on second degree murder as a lesser included offense.[5]

A trial court has a sua sponte duty to instruct on a lesser included offense if the evidence raises a question as to whether the elements of the charged offense are present, but not if there is no evidence that the offense was less than charged. (*People v. Valdez, supra*, 32 Cal.4th at p. 115; see *id.* at pp. 140–141 (dis. opn. of Chin, J.).) In this case, the defense argued that defendant was not the gunman. If he was not, he was guilty of no crime. However, as relevant to this claim, the evidence conclusively established that whoever the gunman was, he was guilty of first degree murder under the special circumstance of robbery murder.

The crime here was videotaped on the market's surveillance cameras. As defense counsel conceded in closing argument, the videotapes showed the gunman robbing the market and fatally shooting San in the course of the attempted robbery. The evidence permits no other conclusion. Indeed, the attempted robbery and shooting together took no more than 12 seconds. There was no substantial evidence, that is, evidence that a reasonable jury would find persuasive (*People v. Valdez, supra*, 32 Cal.4th at p. 116), that the gunman was guilty of a crime less than first degree felony murder. Defendant argues, however, that the jury reasonably could have concluded that the gunman fatally shot the victim but had a reasonable doubt that he killed her

---

[5] We have concluded that first degree premeditated murder is not a lesser included offense of first degree felony murder, but have left open the question as to second degree murder. (*People v. Valdez, supra*, 32 Cal.4th at pp. 114–115, fn. 17.)

"for the purpose of robbing her." Even if true, it does not matter. The jury did not have to find that defendant killed San for the purpose of robbery: "The prosecution only needed to prove that the victim was killed during the course of a robbery—accidentally or otherwise." (*People v. Valdez, supra,* 32 Cal.4th at p. 116, fn. 19.) ■ Moreover, as relevant here, "[a] robbery is not complete until the perpetrator reaches a place of temporary safety . . . ," which is not the scene of the robbery. (*People v. Young* (2005) 34 Cal.4th 1149, 1177 [24 Cal.Rptr.3d 112, 105 P.3d 487].) The gunman here obviously had not reached a place of temporary safety when he killed San on the spot.

Defendant points to the verdict in Sadewater's trial, which, he argues, suggests that "Sadewater's jury believed the attempted robbery was a separate crime—for which the jury held Sadewater responsible under a theory of aiding and abetting—from the killing, of which Sadewater was found not guilty."[6] But whatever the jury might have thought in that trial, it is not evidence *in this case.* (See *People v. Palmer* (2001) 24 Cal.4th 856, 858 [103 Cal.Rptr.2d 13, 15 P.3d 234] ["If substantial evidence supports a jury verdict as to one defendant, that verdict may stand despite an apparently inconsistent verdict as to another defendant."].) Defendant also notes that the prosecution argued to the jury that the killing was "in cold blood" and execution style, suggesting it was premeditated or perhaps second degree malice murder rather than first degree felony murder. These two concepts, however, are not mutually exclusive. The killing may well have been premeditated, and it most certainly was done with malice. But whether or not the killing was premeditated or malicious, the evidence permitted no conclusion other than that it was committed during the course of a robbery, which makes the crime first degree felony murder. Thus, a lesser included offense instruction on second degree murder was not warranted.

Moreover, the failure to instruct on any lesser included offense did not violate defendant's constitutional rights as construed in *Beck v. Alabama* (1980) 447 U.S. 625 [65 L.Ed.2d 392, 100 S.Ct. 2382]. (*People v. Prince* (2007) 40 Cal.4th 1179, 1269 [57 Cal.Rptr.3d 543, 156 P.3d 1015]; *People v. Waidla* (2000) 22 Cal.4th 690, 736, fn. 15 [94 Cal.Rptr.2d 396, 996 P.2d 46].) First, "*Beck v. Alabama, supra,* 447 U.S. 625, and its progeny do not require that a court instruct upon a lesser included offense as to which substantial evidence is lacking." (*People v. Prince, supra,* 40 Cal.4th at p. 1269.) Second,

---

[6] As further support for this argument, defendant contends that the robbery and murder were "separate acts" pursuant to *People v. Sandoval* (1994) 30 Cal.App.4th 1288, 1299 [36 Cal.Rptr.2d 646], and related cases. However, as the Attorney General correctly points out, *Sandoval* is inapposite because it dealt with what constitutes "separate acts" for purposes of sentencing under section 654. The "separate acts" inquiry is not central to the felony-murder rule. (See *People v. Nguyen* (1988) 204 Cal.App.3d 181, 193 [251 Cal.Rptr. 40] [murder and robbery may be separate acts for purposes of § 654, "notwithstanding that for purposes of the felony-murder rule the robbery is still considered to be ongoing"].)

the principle of *Beck* is not implicated in this case because, unlike in *Beck*, the jury here was not forced to decide between capital murder and innocence. In other words, even if the jury found defendant guilty of first degree murder on the theory of felony-murder robbery under the felony-murder-robbery special circumstance, "it was not legally compelled to fix the penalty at death, but could fix it instead at a term of imprisonment for life without possibility of parole." (*People v. Waidla, supra,* 22 Cal.4th at p. 736, fn. 15.)

■ Finally, defendant adds that a "truncated" and incomplete version of the robbery-murder special-circumstance instruction (CALJIC No. 8.81.17)— which did not contain the optional second paragraph—exacerbated any prejudice from the failure to give a second degree murder instruction. (See *People v. Valdez, supra,* 32 Cal.4th at p. 146 (dis. opn. of Chin, J.).) Not so. The trial court has no duty to instruct with this second paragraph where there is no evidence supporting "an inference that the defendant might have intended to murder the victim without having an independent intent to commit the specified felony." (*People v. Monterroso* (2004) 34 Cal.4th 743, 767 [22 Cal.Rptr.3d 1, 101 P.3d 956].) No evidence suggested that defendant here had an independent intent apart from committing the robbery. (Cf. *People v. Valdez, supra,* 32 Cal.4th at p. 144 (dis. opn. of Chin, J.) [evidence suggested defendant and the victim knew each other, which may have "presented other possible motives"].)

### 2. *Instructions Regarding Shanta Sadewater's Testimony*

Claiming that the "prosecution's case rose and fell on" Sadewater's testimony, defendant argues that the trial court's use of CALJIC No. 2.13 and its failure to give CALJIC No. 2.71.7 denied him his right to due process and his right against the arbitrary imposition of the death penalty. (U.S. Const., 5th, 8th & 14th Amends.)

At this trial, Sadewater testified at the guilt phase as follows. She first claimed no knowledge of or responsibility for the fatal shooting at Seng Heng Market, but later admitted to police her involvement. On the day of the shooting, while Sadewater and defendant were driving around, defendant told her he was waiting to hear from a friend named Twin, with whom he was going to rob a drug dealer named Reggie. Sadewater stopped at the Seng Heng Market to buy cigarettes, and when she returned to the car, defendant asked Sadewater if she was willing to "hit that store," which she took to mean, rob the market. She replied she would not. On their way back towards the market, defendant said he "was going to go check for himself" and asked Sadewater to pull over. The shooting occurred thereafter. During his guilt-phase testimony, defendant denied robbing Seng Heng Market or shooting

San. In its closing argument, the prosecution referred to Sadewater's statements to police and her testimony at her own trial, which both corroborated her testimony here.

The trial court instructed the jury with CALJIC No. 2.13, which told the jury it may consider a witness's prior consistent or inconsistent statement for purposes of judging the witness's credibility and as evidence of the truth of the facts the witness recounted on the prior occasion. It did not give, nor did defendant request, the standard instruction on viewing a defendant's preoffense oral statements with caution. (CALJIC No. 2.71.7.) Defendant claims the failure to give CALJIC No. 2.71.7, along with the use of CALJIC No. 2.13, gave the jury a false impression that "Sadewater's testimony was as worthy of belief as other witnesses who were not burdened with the same bias or motive to lie about [defendant]'s involvement in the crimes charged."

### a. *CALJIC No. 2.71.7*

A trial court has a sua sponte duty to instruct the jury to view a defendant's oral admissions with caution if the evidence warrants it. (*People v. Dickey* (2005) 35 Cal.4th 884, 905 [28 Cal.Rptr.3d 647, 111 P.3d 921]; *People v. Carpenter* (1997) 15 Cal.4th 312, 393 [63 Cal.Rptr.2d 1, 935 P.2d 708] [purpose of cautionary instruction applies "to any oral statement of the defendant, whether made before, during, or after the crime"].) To determine prejudice, "[w]e apply the normal standard of review for state law error: whether it is reasonably probable the jury would have reached a result more favorable to defendant had the instruction been given." (*People v. Carpenter*, *supra*, 15 Cal.4th at p. 393.) Because the cautionary instruction's purpose is " 'to help the jury to determine whether the statement attributed to the defendant was in fact made, courts examining the prejudice in failing to give the instruction examine the record to see if there was any conflict in the evidence about the exact words used, their meaning, or whether the admissions were repeated accurately. [Citations.]' [Citation.]" (*People v. Dickey*, *supra*, 35 Cal.4th at p. 905.)

The Attorney General concedes that the trial court erred by failing to instruct the jury to view with caution defendant's preoffense statements of intent or planning to Sadewater. However, he argues the error was harmless. We agree.

A defendant's simple denials about making the statements, along with uncontradicted testimony about his statements, may support the conclusion that the instructional error was harmless. (*People v. Dickey*, *supra*, 35 Cal.4th at p. 906.) Here, the record reveals that defendant denied planning to meet someone named Twin, denied knowing anyone named Reggie, and denied

planning to rob Reggie. Although defendant did not specifically deny asking Sadewater if she wanted to "hit" the market or telling her that he wanted to check out the market himself, he did deny he was with Sadewater at the time he made the alleged statements and he ultimately denied robbing Seng Heng Market and fatally shooting San. Given defendant's denials, the issue was whether Sadewater was a credible witness or whether she fabricated her testimony regarding defendant's admissions to her. (See *ibid.*)

While failing to give CALJIC No. 2.71.7, the trial court thoroughly instructed the jury on judging the credibility of a witness. Because Sadewater was originally charged as a codefendant and was convicted of being an accessory after the fact and of attempted robbery, the jury was instructed that Sadewater was an accomplice as a matter of law and that her testimony was subject to the rule requiring corroboration. (CALJIC No. 3.16.) Accordingly, the jury was also instructed to view Sadewater's testimony "with distrust" (CALJIC No. 3.18),[7] that her testimony must be corroborated (CALJIC Nos. 3.11, 3.12), that her felony conviction could be used to evaluate her credibility (CALJIC No. 2.23), and that prior inconsistent statements, inconsistent testimony, and willfully false testimony would all bear on credibility. (CALJIC Nos. 2.13, 2.21.1, 2.21.2, 2.23.) With these instructions and the impeachment of Sadewater's credibility in this regard, the jury was "unquestionably aware" that Sadewater's testimony should be viewed with caution. (*People v. Dickey, supra,* 35 Cal.4th at p. 907; see also *People v. Carpenter, supra,* 15 Cal.4th at p. 393.) Thus, we conclude it was not reasonably probable that the jury would have reached a more favorable verdict had it been instructed with CALJIC No. 2.71.7.

### b. *CALJIC No. 2.13*

Defendant asserts that through the use of CALJIC No. 2.13, the prosecution used Sadewater's prior statements to police and her testimony at her own trial to unfairly bolster its case against defendant. He contends that CALJIC No. 2.13 impermissibly favored the prosecution because the instruction did not tell the jury it could consider Sadewater's statements for their *falsity* as well as for their truth, and that the instruction improperly implied the prior statements were factual because it said the jury could consider them as evidence. We disagree.

Consistent with Evidence Code sections 1235 and 1236, CALJIC No. 2.13, which had been in use since 1979, simply informed the jury that when a witness had spoken *inconsistently* in the past, it may choose to disbelieve the

---

[7] We have since concluded that the phrase "care and caution" better articulates the standard on viewing accomplice testimony than the word "distrust." (*People v. Guiuan* (1998) 18 Cal.4th 558, 569 [76 Cal.Rptr.2d 239, 957 P.2d 928].)

witness's trial testimony and accept the prior statement while, if the witness had spoken *consistently* in the past, the jury may consider this as evidence that the witness had spoken truthfully all along. In this case, once told that the clerk had been killed, Sadewater generally gave a consistent account of the events in her statements to police, her testimony at her own trial, and her testimony at defendant's trial.

Even assuming error, there was no prejudice. (See *People v. Dickey, supra*, 35 Cal.4th at pp. 905–906.) In view of the jury instructions as a whole—particularly those instructions which adequately informed the jury to view Sadewater's testimony with caution (as discussed above)—we conclude that it was not reasonably probable that the jury would have reached a more favorable verdict had it not been instructed with CALJIC No. 2.13. (*People v. Dickey, supra*, 35 Cal.4th at pp. 905–906; see *People v. Guerra* (2006) 37 Cal.4th 1067, 1148–1149 [40 Cal.Rptr.3d 118, 129 P.3d 321] [claims of instructional error evaluated in light of instructions as a whole].)

Because any error in failing to instruct the jury with CALJIC No. 2.71.7 was harmless, and there was no error or prejudice from the giving of CALJIC No. 2.13, we conclude there was no cumulative prejudice.

### 3. *Instruction on First Degree Felony Murder*

█ Defendant contends the trial court erred and violated his constitutional rights in instructing the jury on first degree murder, and that it lacked jurisdiction to try him for such offense, because the information charged him only with second degree malice murder under section 187. (See U.S. Const., 6th, 8th & 14th Amends.; Cal. Const., art. I, §§ 7, 15, 16, 17.) We have consistently rejected that contention. (*People v. Geier* (2007) 41 Cal.4th 555, 591 [61 Cal.Rptr.3d 580, 161 P.3d 104] [citing cases]; *People v. Nakahara* (2003) 30 Cal.4th 705, 712 [134 Cal.Rptr.2d 223, 68 P.3d 1190] ["Felony murder and premeditated murder are not distinct crimes, and need not be separately pleaded."]; *People v. Hughes* (2002) 27 Cal.4th 287, 369 [116 Cal.Rptr.2d 401, 39 P.3d 432].) The high court's decision in *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348], does not mandate a different conclusion. (*People v. Nakahara, supra*, 30 Cal.4th at pp. 712–713.)

### 4. *Instruction on Motive (CALJIC No. 2.51)*

The trial court gave the following standard instruction on motive: "Motive is not an element of the crime charged and need not be shown. However, you may consider motive or lack of motive as a circumstance in this case. Presence of motive may tend to establish the defendant is guilty. Absence of

motive may tend to show the defendant is not guilty." (CALJIC No. 2.51.) Defendant asserts that this instruction unconstitutionally (1) allowed the jury to determine guilt on motive alone; (2) shifted the burden of proof to imply that defendant had to prove innocence; and (3) lessened the prosecution's burden of proof by suggesting the terms "motive" and "intent" were interchangeable. (See U.S. Const., 6th, 8th & 14th Amends.; Cal. Const., art. I, §§ 7, 15.)

The first argument, which "merely goes to the clarity of the instruction," is not cognizable on appeal because defendant failed to request clarification at trial to avoid any implication that motive alone could establish guilt. (*People v. Cleveland* (2004) 32 Cal.4th 704, 750 [11 Cal.Rptr.3d 236, 86 P.3d 302].) Moreover, these arguments are meritless. (See *People v. Snow* (2003) 30 Cal.4th 43, 98 [132 Cal.Rptr.2d 271, 65 P.3d 749] [CALJIC No. 2.51 "leaves little conceptual room for the idea that motive could establish *all* the elements of murder"]; see also *People v. Kelly* (2007) 42 Cal.4th 763, 792 [68 Cal.Rptr.3d 531, 171 P.3d 548] [citing cases].) " 'The motive instruction did not itself include instructions on the prosecution's burden of proof and the reasonable doubt standard, but it also did not undercut other instructions that correctly informed the jury that the prosecution had the burden of proving guilt beyond a reasonable doubt.' " (*People v. Kelly, supra,* 42 Cal.4th at p. 792, quoting *People v. Cleveland, supra,* 32 Cal.4th at p. 750.)

We reject defendant's specific claim that the jury inevitably confused "motive," as outlined in CALJIC No. 2.51, with the element of "intent." "[A]lthough malice and certain intents and purposes are elements of the crimes, as the court correctly instructed the jury, *motive* is not an element. . . . Motive describes the reason a person chooses to commit a crime. The reason, however, is different from a required mental state such as intent or malice." (*People v. Hillhouse* (2002) 27 Cal.4th 469, 503–504 [117 Cal.Rptr.2d 45, 40 P.3d 754].) As relevant here, the jury was instructed that intent was a necessary element of attempted robbery (CALJIC No. 9.40). (See *People v. Guerra, supra,* 37 Cal.4th at p. 1135.) We conclude the instructions here as a whole did not refer to motive and intent interchangeably, and there was no reasonable likelihood the jury understood the terms to be synonymous. (See *ibid.*)

Contrary to defendant's contention, *People v. Maurer* (1995) 32 Cal.App.4th 1121, 1126–1127 [38 Cal.Rptr.2d 335], is distinguishable because, in that case, motive *was* an element of the crime for which the defendant was convicted. (See *People v. Hillhouse, supra,* 27 Cal.4th at p. 504.) The trial court gave no instruction that purportedly interchanged motive and intent. (Cf. *ibid.* [force instruction stating that " 'robbery must be *motivated* by the intent to steal' " did not transform such intent into motive].)

5. *Instructions Undermining the Reasonable Doubt Standard*

Defendant contends that various instructions relating to the prosecution's burden of proof were constitutionally defective. (CALJIC Nos. 1.00, 2.01, 2.21.2, 2.22, 2.27, 2.51, 8.83.1.) He asserts that these instructions in various combinations resulted in "the dilution of the reasonable-doubt requirement," thereby violating his rights to due process, trial by jury, and a reliable capital trial. (U.S. Const., 6th, 8th & 14th Amends.; Cal. Const., art. I, §§ 7, 15, 17.) We reject each of these claims.

■■■ Defendant claims that CALJIC Nos. 2.01 and 8.83.1, which directed the jury to accept reasonable inferences and reject unreasonable ones, impermissibly (1) compelled the jury to find defendant guilty on all counts and to find the special circumstance true by using a standard lower than proof beyond a reasonable doubt, and (2) required the jury to draw an incriminatory inference when the inference merely seemed "reasonable." Not so. These instructions do not create " 'an impermissible mandatory conclusive presumption of guilt' " (*People v. Nakahara, supra,* 30 Cal.4th at p. 714), nor do they "permit the jury to base a determination of guilt on something less than proof beyond a reasonable doubt" (*People v. Jurado* (2006) 38 Cal.4th 72, 127 [41 Cal.Rptr.3d 319, 131 P.3d 400]).

■■■ Defendant also argues that five instructions (CALJIC Nos. 1.00, 2.21.2, 2.22, 2.27, 2.51) unconstitutionally lowered the requisite standard of proof. We have repeatedly rejected such challenges to these instructions, and do so again here. (*People v. Jurado, supra,* 38 Cal.4th at p. 127; *People v. Carey* (2007) 41 Cal.4th 109, 131 [59 Cal.Rptr.3d 172, 158 P.3d 743].) We reiterate that each of these instructions "is unobjectionable when, as here, it is accompanied by the usual instructions on reasonable doubt, the presumption of innocence, and the People's burden of proof." (*People v. Nakahara, supra,* 30 Cal.4th at p. 715.) As discussed above (see *ante,* at pp. 21–22), we have rejected defendant's challenges to CALJIC No. 2.51. We see no basis to reconsider any of these holdings.

C. *Penalty Phase*

1. *Removal of a Juror Without Sufficient Cause*

On May 10, 1998, the second day of penalty phase deliberations, the trial court received a note from the jury foreperson which read: "We have a juror whose decision was made up prior to deliberation. Please advise." Out of the presence of other jurors, the trial court questioned the jury foreperson, Juror No. 5, about the note. Juror No. 5 explained that one juror had already made

a decision about penalty before such deliberations began, and that she was not going to change her mind.[8] Juror No. 5 identified the person as Juror No. 1.

The trial court next questioned Juror No. 1. The juror admitted that she had "more or less" made up her mind about penalty and that she was not going to be swayed by further discussion. She confirmed that she had that view when the jury was sent back to begin penalty phase deliberations. After conferring with the prosecution and defense counsel on what to do next, the trial court asked Juror No. 1 one final question: "You have indicated that you pretty much had your feelings or your mind made up when you began your discussions. [¶] Are you willing at this point in time to listen with an open mind to the argument of the other jurors or do you feel that your mind is made up at this point in time?" The juror answered: "If there was eleven and I was the only one, I would go with them." She repeated that she would go along with the other 11 jurors, even if she felt strongly about her own contrary position.

After Juror No. 1 left the courtroom, the prosecutor stated he believed the juror, who was elderly and appeared to be tired, was violating her duty as a juror. The trial court agreed: "She appears to be wearing at this point. Her

---

[8] The following exchange took place:

"The Court: Without giving us any information how the jury may be divided, if they are divided or otherwise, can you tell us why it is that you believe that someone, without specifying who it is, is not deliberating appropriately?

"Juror No. 5: She told us that she had made up her mind before she came in. She told us three times.

"The Court: She announced that even prior to you beginning discussions?

"Juror No. 5: Well, we had been sitting and talking and discussing it. And she said, after we took our first vote, that there was no way she was going to change her mind, she had made up her mind before she went in there. So she said there was no way she would change her mind.

"The Court: And did that person participate at all in any of the discussions?

"Juror No. 5: No. I asked her—I went around the table and asked everyone their opinions, even those who weren't so open. You have people that are listeners and you have people that are, you know—that like to talk and like to get their opinions out. So I went around the table asking those that weren't so open to discussing their opinions. And I asked her and she said she had made up her mind. She said before we got in there that she had made up her mind and that there was no way. [¶] We asked her—we also—two people also stated, 'Well, you were told, the instructions were told you [sic] or as they were discussed with us that you weren't supposed to have predisposed'—

"The Court: Okay. After you brought that to the person's attention, did the person then participate in discussions or attempt to express their ideas or why they felt the way that they felt?

"Juror No. 5: 0. [Sic.]

"The Court: Just flat out—

"Juror No. 5: Flat out nothing.

"The Court: 'I made up my mind and I'm not going to change it'?

"Juror No. 5: She's ready to go home."

statement that she would simply go along with the other eleven jurors if she were the holdout, notwithstanding her own feelings about the correctness of her position, that coupled with the report by the foreperson of the jury, it does not appear that this juror is participating in a meaningful way in deliberations." The trial court discharged Juror No. 1 for failing to deliberate, and replaced her with an alternate juror. Defendant did not object to the substitution, nor did he move for a mistrial.[9]

On appeal, defendant asserts that Juror No. 1 did not fail to deliberate. He contends she did not violate her oath as a juror, and she should not have been discharged simply because she disagreed with other jurors. He argues therefore that the trial court abused its discretion in removing her without sufficient cause, and that her removal requires reversal of the penalty determination and death judgment. He maintains the trial court's actions violated his rights to have his trial completed by a particular tribunal, to an impartial jury, to due process, and to a reliable capital sentencing determination. (U.S. Const., 6th, 8th & 14th Amends.; Cal. Const., art. I, §§ 7, 15.) Because defendant failed to object or to move for a mistrial, he has forfeited his claim of error. (See *People v. Cunningham* (2001) 25 Cal.4th 926, 1029 [108 Cal.Rptr.2d 291, 25 P.3d 519].) His claim also fails on the merits.

■ As relevant here, a trial court may discharge a juror for "good cause" at any time if the juror "is found to be unable to perform his or her duty." (§ 1089.)[10] "A juror who refuses to follow the court's instructions is 'unable to perform his duty' within the meaning of Penal Code section 1089." (*People v. Williams* (2001) 25 Cal.4th 441, 448 [106 Cal.Rptr.2d 295, 21 P.3d 1209].) Such instructions here included that each juror render a verdict "according to the evidence presented and the instructions of the court" (see Code Civ. Proc., § 232, subd. (b)), and that each juror "will consider all of the evidence, follow the law, exercise your discretion conscientiously, and reach a just verdict." "A juror who actually refuses to deliberate is subject to discharge by the court [citation] . . . ." (*People v. Engelman* (2002) 28 Cal.4th 436, 442 [121 Cal.Rptr.2d 862, 49 P.3d 209], citing *People v. Cleveland* (2001) 25 Cal.4th 466, 484 [106 Cal.Rptr.2d 313, 21 P.3d 1225].) "A refusal to deliberate consists of a juror's unwillingness to engage in the deliberative process; that is, he or she will not participate in discussions with fellow jurors by listening to their views and by expressing his or her own views. Examples of refusal to deliberate include, but are not limited to, expressing a fixed conclusion at the beginning of deliberations and refusing to consider other

---

[9] Defense counsel implicitly agreed that excusing the juror might be proper: "If she is not deliberating and following the law, that's one thing."

[10] In pertinent part, section 1089 provides: "If at any time, whether before or after the final submission of the case to the jury, a juror dies or becomes ill, or upon other good cause shown to the court is found to be unable to perform his or her duty, . . . the court may order the juror to be discharged and draw the name of an alternate, who shall then take a place . . . ."

points of view, refusing to speak to other jurors, and attempting to separate oneself physically from the remainder of the jury." (*People v. Cleveland, supra,* 25 Cal.4th at p. 485; see *People v. Engelman, supra,* 28 Cal.4th at p. 449 [juror's duty is "to deliberate with an open mind"].)

We review a trial court's decision to discharge a juror under an abuse of discretion standard, and will uphold such decision if the record supports the juror's disqualification as a demonstrable reality. (*People v. Barnwell* (2007) 41 Cal.4th 1038, 1052–1053 [63 Cal.Rptr.3d 82, 162 P.3d 596] [explicitly holding that more stringent "demonstrable reality" standard is applicable in juror removal cases]; see also *People v. Guerra, supra,* 37 Cal.4th at p. 1158.) The demonstrable reality test "requires a showing that the court as trier of fact *did* rely on evidence that, in light of the entire record, supports its conclusion that [disqualification] was established." (*People v. Barnwell, supra,* 41 Cal.4th at pp. 1052–1053.) To determine whether the trial court's conclusion is "manifestly supported by evidence on which the court actually relied," we consider not just the evidence itself, but also the record of reasons the court provided. (*Id.* at p. 1053.) In doing so, we will not reweigh the evidence. (*Ibid.*)

Applying these general principles to the circumstances of this case, we conclude that the trial court's decision to discharge Juror No. 1. was not an abuse of discretion because the juror's refusal to deliberate appears in the record as a demonstrable reality. The trial court here expressly found that Juror No. 1 was not "participating in a meaningful way in deliberations" based on the jury foreperson's report that Juror No. 1 had made a final decision about penalty before deliberations began, and Juror No. 1's statement that she would simply go along with the other 11 jurors if she were the holdout and held a contrary position. As the jury foreperson explained, Juror No. 1 repeatedly told other jurors she had already made up her mind, and did not participate in any of the discussions. Juror No. 1 essentially confirmed this account to the court. As discussed above, "expressing a fixed conclusion at the beginning of deliberations and refusing to consider other points of view," and failing to "participate in discussions with fellow jurors" both constitute a refusal to deliberate. (*People v. Cleveland, supra,* 25 Cal.4th at p. 485.)

Moreover, Juror No. 1's admission that she would go along with the other 11 jurors if they all agreed on a position, even if she strongly disagreed with them, also subjected her to discharge. (See *People v. Engelman, supra,* 28 Cal.4th at p. 442 ["juror who proposes to reach a verdict without respect to the law or the evidence" is subject to discharge]; *People v. Williams, supra,* 25 Cal.4th at p. 463 [reaffirming "basic rule that jurors are required to determine the facts and render a verdict in accordance with the court's instructions on

the law"; jurors unable to do so are subject to discharge].) " 'Acquiescence simply because the verdict has been reached by the majority is not an independent judgment, and if permitted, would undermine the right to a unanimous verdict.' " (*People v. Gainer* (1977) 19 Cal.3d 835, 849 [139 Cal.Rptr. 861, 566 P.2d 997].)

Contrary to defendant's contention, this is not a situation where the juror had doubts about the sufficiency of the prosecution's evidence, viewed the evidence differently from the way other jurors viewed it, or, after participating in deliberations for a reasonable time, expressed the belief that further discussions would not alter her view. (*People v. Cleveland, supra*, 25 Cal.4th at pp. 483, 486 [finding trial court abused discretion in discharging juror].) Nothing in the record supports these scenarios. Though defendant emphasizes that Juror No. 1 told other jurors she had already made up her mind *after* the jury's first vote (which assertedly indicates she was participating in deliberations), this does not contradict Juror No. 1's direct statement that she had already made up her mind at the *start* of penalty deliberations, a fact she confirmed several times to the trial court. We are confident the trial court's conclusion that Juror No. 1 was not meaningfully participating in deliberations is "manifestly supported by evidence on which the court actually relied." (*People v. Barnwell, supra*, 41 Cal.4th at p. 1053.)

## 2. *Instructional Errors*

At the end of the penalty phase, the trial court instructed the jury on the following standard instructions: CALJIC Nos. 8.84.1 (duty of jury—penalty proceeding), 8.85 (penalty trial—factors for consideration), and 8.88 (penalty trial—concluding instruction). As relevant here, CALJIC No. 8.84.1 directed jurors to "accept and follow the law" in the penalty phase only as the trial court instructs, and to "[d]isregard all other instructions given to you in other phases of this trial." The court also instructed with five special instructions.[11]

---

[11] The first special instruction told the jury it could not consider the deterrent effect of the death penalty or the cost to the state of execution or of maintaining a prisoner for life without possibility of parole in determining penalty.

The second instruction read: "The factors which I have listed are the only ones you may find to be aggravating factors, and you cannot take into account any other facts or circumstances as a basis for imposing the penalty of death on the defendant."

The third instruction stated that neither side had a burden of proof at the penalty phase and that "[i]t is not required that all twelve jurors agree on whether or not a factor in aggravation or mitigation has been proven before an individual juror may consider it." The fourth instruction told the jury that it could consider sympathy or pity for defendant, and "[i]f supported by the evidence, it is also permissible to consider sympathy, and the impact on the victim's family when determining the circumstances of the case."

The final instruction read: "Evidence was introduced at the guilt phase of this trial tending to show that the defendant may have committed other crimes. This evidence is insufficient to

Defendant argues that the trial court erred by failing to reinstruct the jury at the penalty phase with applicable guilt phase instructions, "beginning with CALJIC 1.01, concluding with CALJIC 8.88," as suggested in the Use Note to CALJIC No. 8.84.1. (Use Note to CALJIC No. 8.84.1 (7th ed. 2005) p. 445.) Specifically, he alleges that the trial court should have instructed with CALJIC Nos. 1.02 (statements of counsel—evidence stricken out—insinuations of questions—stipulated facts), 2.10 (statements made by defendant to physician), 2.20 (believability of witness), 2.22 (weighing conflicting testimony), 2.27 (sufficiency of testimony of one witness), 2.71.7 (preoffense statement by defendant), 2.80 (expert testimony—qualifications of expert), and 2.82 (hypothetical questions). He also contends the trial court should have instructed the jury with CALJIC Nos. 17.30 through 17.50, which include cautionary instructions, instructions on the jurors' duties, and concluding instructions.

At bottom, defendant claims that the lack of affirmative guidance at the penalty phase, along with the specific instruction that the jury not consider guilt phase instructions (CALJIC No. 8.84.1), precluded a fair, reliable, and consistent capital sentencing determination, in violation of the state and federal Constitutions. Assuming the trial court erroneously failed to give applicable instructions at the penalty phase, we conclude any error was harmless. (See *People v. Carter* (2003) 30 Cal.4th 1166, 1221–1222 [135 Cal.Rptr.2d 553, 70 P.3d 981].)

Under the state standard, an error at the penalty phase of a capital trial is prejudicial if "there is a reasonable *possibility* the error affected the verdict." (*People v. Gonzalez* (2006) 38 Cal.4th 932, 960–961 [44 Cal.Rptr.3d 237, 135 P.3d 649].) This test is effectively the same as that under *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824], which asks whether the error is harmless beyond a reasonable doubt. (*People v. Gonzalez, supra*, 38 Cal.4th at p. 961.) While we focus on the "reasonable possibility" test, our conclusion applies equally to *Chapman*'s "reasonable doubt" test. (*People v. Gonzalez, supra*, 38 Cal.4th at pp. 960–961.) After examining the evidence presented at the penalty phase, we conclude there was no reasonable possibility the omitted instructions affected the jury's evaluation of the evidence. (See *People v. Carter, supra*, 30 Cal.4th at pp. 1220–1221.)

First, we reject defendant's assertion that without instructions concerning an expert's testimony (CALJIC Nos. 2.10, 2.80, 2.82), the jury likely did not give due weight to Dr. Taylor's testimony, and yet impermissibly considered defendant's drug use and other criminal history as aggravating evidence. There is nothing to suggest that the jury did not properly assess Dr. Taylor's

---

establish that the defendant committed those crimes and cannot be considered by you in determining the penalty to be imposed."

testimony in the absence of CALJIC No. 2.80, which instructs the jury it is not bound by expert testimony but may accord such testimony whatever weight it deserves. As in *People v. Carter*, the jury here "expressed no confusion or uncertainty [about how to evaluate Dr. Taylor's testimony] and never requested clarification." (*People v. Carter*, *supra*, 30 Cal.4th at p. 1221.) Moreover, with respect to defendant's prior drug use, the jury was instructed that although evidence was introduced in the guilt phase tending to show defendant committed other crimes, such " 'evidence is insufficient to establish that the defendant committed those crimes and cannot be considered by you in determining the penalty to be imposed.' " (Fn. 11, *ante*, at pp. 27–28.) The court also instructed the jury not to consider other aggravating circumstances or factors, except those the court listed, " 'as a basis for imposing the penalty of death on the defendant.' " (*Id.* at p. 27.) We presume the jury followed these instructions. (*People v. Yeoman* (2003) 31 Cal.4th 93, 139 [2 Cal.Rptr.3d 186, 72 P.3d 1166].) In addition, although defendant generally criticizes the trial court for omitting a "fundamental" instruction defining evidence (CALJIC No. 2.00), he "does no more than speculate that [its] absence somehow prejudiced him." (*People v. Carter*, *supra*, 30 Cal.4th at p. 1221.) That is not enough.

Second, we reject defendant's claim based on the trial court's failure to give CALJIC No. 1.02, the standard instruction that the attorneys' statements are not evidence. He maintains that without this instruction, the jury improperly considered the prosecution's cross-examination question to Dr. Taylor on whether Dr. Taylor could "guarantee that the defendant will not act out with violence should he get his hands, again, on prison-type shanks." After the prosecution withdrew the question, which impermissibly bore on defendant's future dangerousness, the trial court made clear in a sidebar conference that "[t]here was no answer for [jurors] to ignore at this point or to disregard at this point. They were instructed previously that the question itself is not evidence." This sidebar occurred before the trial court instructed the jury to disregard guilt phase instructions. Defendant complains that the trial court did not specifically admonish the jury to disregard the prosecution's question, which, as we understand defendant's argument, would have presumably cured any prejudice from later instructing the jury to disregard all guilt phase instructions such as CALJIC No. 1.02. Not so. With special penalty phase instructions directing the jury to disregard other aggravating facts or circumstances and any evidence tending to show defendant committed other crimes (see *ante*, at pp. 27, fn. 11, 29), we conclude defendant was not prejudiced by the omission of CALJIC No. 1.02. (*People v. Carter*, *supra*, 30 Cal.4th at pp. 1221–1222.)

Third, we reject defendant's argument that the failure to reinstruct the jury with instructions to view Sadewater's guilt phase testimony with caution was

prejudicial. (See CALJIC Nos. 2.20, 2.22, 2.27, 2.71.7.) On cross-examination, the prosecution questioned Dr. Taylor about his report in which he wrote that "the profile suggests that the individual has a preference for action and is inclined to act out. They are action-oriented individuals who tend to act out their conflict in an impulsive way." After being asked whether he was aware defendant had been planning a robbery all day long on the day of the murder, Dr. Taylor replied he had read about a discussion of planning in the police report. Dr. Taylor agreed with the prosecution that "[a] seven or eight hour time period in which a person has to reflect upon a course of conduct" is not impulsive. Defendant argues that because evidence that he "had been planning a robbery all day long came only from Sadewater's testimony at the guilt phase—testimony that the jury was not properly instructed to view with caution," the failure to give instructions to view her testimony with caution was prejudicial.

We disagree. As Dr. Taylor's own testimony revealed, his opinion that planning a robbery did not constitute impulsive behavior was based not on Sadewater's guilt phase testimony, but on police reports he had reviewed. Moreover, Sadewater did not testify at the penalty phase. Because the need for certain guilt phase instructions at the penalty phase is obviously determined by what evidence is admitted at the penalty phase, we fail to see how the court erred in failing to reinstruct the jury with respect to Sadewater's guilt phase testimony. In any event, as revealed by the jury's guilty verdict and special circumstance finding, the jury had already chosen to believe Sadewater's testimony and to disbelieve defendant's testimony.

Finally, we reject defendant's claim that the trial court erred in failing to instruct sua sponte with CALJIC Nos. 17.30 through 17.50, which include cautionary instructions, instructions on the jurors' duties, and concluding instructions. While the Use Note to CALJIC No. 8.84.1 refers to CALJIC Nos. 1.01 through 8.88, it makes no reference to CALJIC Nos. 17.30 through 17.50. Defendant provides no authority supporting his claim that the trial court had a sua sponte duty in this regard; nor, we add, does he argue that the failure to give such instructions resulted in prejudice here. Thus, by failing to request such instructions at trial, defendant has waived this claim.

Based on the foregoing, we conclude there was no reasonable possibility that the omission of various guilt phase instructions at the penalty phase affected the penalty verdict. (*People v. Carter, supra,* 30 Cal.4th at p. 1221.)

### 3. *Intercase Proportionality*

Defendant contends that the absence of intercase proportionality review renders the death penalty statute and his death sentence arbitrary and

capricious under the Eighth and Fourteenth Amendments to the United States Constitution. We have repeatedly rejected this claim. (*People v. Cook* (2007) 40 Cal.4th 1334, 1368 [58 Cal.Rptr.3d 340, 157 P.3d 950]; *People v. Moon* (2005) 37 Cal.4th 1, 48 [32 Cal.Rptr.3d 894, 117 P.3d 591]; see also *Pulley v. Harris* (1984) 465 U.S. 37, 50–51 [79 L.Ed.2d 29, 104 S.Ct. 871] [federal Constitution does not require intercase proportionality review].) Although defendant argues that "[t]he time has come for *Pulley v. Harris* to be reevaluated," he presents no compelling reason for us to do so. (See *People v. Moon, supra,* 37 Cal.4th at p. 48 [rejecting identical claim].)

### 4. *Challenges to Death Penalty Scheme*

Defendant raises several constitutional challenges to the death penalty statute and related jury instructions. (See U.S. Const., 5th, 6th, 8th & 14th Amends.) We have consistently considered and rejected these claims, and do so again here. Specifically, we conclude that the death penalty scheme is not unconstitutional because it fails to allocate the burden of proof—or establish the standard of proof—for finding the existence of an aggravating factor, or because it does not require the jury to find that the aggravating factors outweigh the mitigating factors, or that death is the appropriate penalty. (*People v. Geier, supra,* 41 Cal.4th at p. 618; *People v. Stitely* (2005) 35 Cal.4th 514, 573 [26 Cal.Rptr.3d 1, 108 P.3d 182].) The high court decisions in *Blakely v. Washington* (2004) 542 U.S. 296 [159 L.Ed.2d 403, 124 S.Ct. 2531], *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428], and *Apprendi v. New Jersey, supra,* 530 U.S. 466, do not alter our conclusions in this regard. (*People v. Stitely, supra,* 35 Cal.4th at p. 573.)

We also conclude that the penalty phase instructions were not defective in failing to assign a burden of persuasion regarding the jury's penalty decision (*People v. Smith* (2005) 35 Cal.4th 334, 370–371 [25 Cal.Rptr.3d 554, 107 P.3d 229]), in failing to require juror unanimity on the aggravating factors (*People v. Abilez* (2007) 41 Cal.4th 472, 533 [61 Cal.Rptr.3d 526, 161 P.3d 58]), or in failing to include an instruction on the "presumption of life" (*People v. Geier, supra,* 41 Cal.4th at p. 618).

### 5. *Instruction on Jury's Sentencing Discretion (CALJIC No. 8.88)*

The trial court instructed the jury with a modified version of CALJIC No. 8.88, which explained the jury's consideration of aggravating and mitigating factors in deciding between the two penalties, death or life imprisonment without the possibility of parole. Defendant raises several constitutional challenges to this instruction, all of which we have previously rejected. (*People v. Moon, supra,* 37 Cal.4th at p. 43.) Contrary to defendant's arguments, CALJIC No. 8.88 is not unconstitutionally vague because it

uses the phrase "so substantial" (*People v. Moon, supra,* 37 Cal.4th at p. 43); it is not unconstitutional in failing to inform the jury that death must be the appropriate penalty, not just the warranted penalty (*ibid.*); it is not unconstitutional for failing to inform the jury that if it finds mitigating circumstances outweigh aggravating circumstances, it is required to impose a sentence of life without the possibility of parole (*id.* at p. 42); and it does not reduce the prosecution's burden of proof (*id.* at pp. 43–44 [rejecting arguments based on burden of proof]).

### 6. *Instructions on Section 190.3 Sentencing Factors*

Defendant also challenges the constitutionality of CALJIC No. 8.85, which outlines section 190.3's mitigating and aggravating factors a jury considers in determining whether to impose a sentence of death or life without parole. He contends that the application of section 190.3, factor (a) ("circumstances of the crime") through CALJIC No. 8.85 does not sufficiently narrow the class of death-eligible offenders, resulting in the arbitrary and capricious imposition of the death penalty. Moreover, he argues that the instruction as given unconstitutionally (1) failed to delete inapplicable sentencing factors; (2) failed to instruct that statutory mitigating factors are relevant solely as mitigators; (3) included restrictive adjectives ("extreme," "substantial") to define certain mitigating factors, which purportedly impeded the jurors' consideration of mitigating evidence; and (4) failed to require written findings as to aggravating factors the jury found and considered in imposing a death sentence, thus precluding meaningful appellate review. (See U.S. Const., 5th, 6th, 8th & 14th Amends.)

We have repeatedly rejected each of these challenges. (*People v. Geier, supra,* 41 Cal.4th at pp. 619–620 [citing cases].) Specifically, the breadth of the "circumstances of the crime" factor (§ 190.3, factor (a)) does not result in the arbitrary and capricious application of the death penalty. (*People v. Smith, supra,* 35 Cal.4th at p. 373.) Also, the trial court did not err in failing to delete inapplicable sentencing factors (*People v. Stitely, supra,* 35 Cal.4th at p. 574); the instruction was not deficient in failing to tell the jury that mitigating factors were relevant only to mitigation (*People v. Ramos* (2004) 34 Cal.4th 494, 530 [21 Cal.Rptr.3d 575, 101 P.3d 478]); including certain adjectives did not impede jurors from considering mitigating evidence (*People v. Box* (2000) 23 Cal.4th 1153, 1217 [99 Cal.Rptr.2d 69, 5 P.3d 130]); and failing to require a written statement of the jury's findings did not preclude meaningful appellate review (*People v. Stitely, supra,* 35 Cal.4th at p. 574). Finally, CALJIC No. 8.85 as given did not violate defendant's equal protection rights. (*People v. Blair* (2005) 36 Cal.4th 686, 754 [31 Cal.Rptr.3d 485, 115 P.3d 1145] ["the availability of procedural protections such as jury unanimity or written factual findings in noncapital cases does not signify that

California's death penalty statute violates equal protection principles"]; see also *People v. Cornwell* (2005) 37 Cal.4th 50, 103 [33 Cal.Rptr.3d 1, 117 P.3d 622].) Defendant identifies no basis for us to reconsider these holdings.

### 7. *International Law*

Defendant contends his death sentence violates the International Covenant on Civil and Political Rights because the imposition of the death penalty as a regular form of punishment is contrary to international norms of human decency. While recognizing we have rejected such claims, defendant asks us to reconsider our decisions "and, in the context of his case, find his death sentence violates international law." (See, e.g., *People v. Brown* (2004) 33 Cal.4th 382, 403–404 [15 Cal.Rptr.3d 624, 93 P.3d 244]; *People v. Hillhouse*, *supra*, 27 Cal.4th at p. 511.) Defendant fails to identify any basis for reconsideration or for reversal of his sentence.

As we have consistently held, "International law does not prohibit a sentence of death rendered in accordance with state and federal constitutional and statutory requirements." (*People v. Hillhouse*, *supra*, 27 Cal.4th at p. 511; accord, *People v. Boyer*, *supra*, 38 Cal.4th at p. 489.) Because defendant's trial did not include any violations of state or federal law, "we decline to find the law defective based on any provision of international law." (*People v. Brown*, *supra*, 33 Cal.4th at p. 404.) We also reject defendant's related claim that the Eighth Amendment, which defendant asserts adopts evolving standards of decency of civilized nations, prohibits the use of death as a regular form of punishment.

### 8. *Cumulative Error*

Defendant claims that while individual errors at the guilt and penalty phases may not be prejudicial in isolation, the combined effect of these errors prejudicially impacted his trial in violation of the state and federal Constitutions. In the one instance in which we have found error (see *ante*, at pp. 19–20), we concluded that such error was harmless. Thus, having found no prejudicial error, we reject this claim. (See *People v. Tafoya* (2007) 42 Cal.4th 147, 199 [64 Cal.Rptr.3d 163, 164 P.3d 590].)

### III. Disposition

For the foregoing reasons, we affirm the judgment.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Moreno, J., and Corrigan, J., concurred.

**WERDEGAR, J.,** Concurring.—I concur generally in the majority's reasoning and result. In particular, I agree defendant forfeited his argument that the trial court erred by denying two of his challenges for cause because, although he removed the two prospective jurors using peremptory challenges and subsequently exhausted the number of such challenges allotted to him by statute, he did not thereafter express his dissatisfaction with the jury as constituted. (Maj. opn., *ante*, at p. 14.) I also agree that even assuming he had preserved the issue for our consideration, neither prospective juror demonstrated his or her views would prevent or substantially impair the prospective juror's ability to serve on the jury.

Our conclusion on the forfeiture issue, however, raises a small but important issue, namely, what exactly must a litigant do to preserve such a claim for appeal? Unfortunately, this court has been less than consistent on this point. On the one hand, we have held that "[t]o preserve a claim based on the trial court's overruling a defense challenge for cause, a defendant must show (1) he used an available peremptory challenge to remove the juror in question; (2) he exhausted all of his peremptory challenges *or can justify the failure to do so*; and (3) he expressed dissatisfaction with the jury ultimately selected." (*People v. Maury* (2003) 30 Cal.4th 342, 379 [133 Cal.Rptr.2d 561, 68 P.3d 1], italics added; see also *People v. Avila* (2006) 38 Cal.4th 491, 539 [43 Cal.Rptr.3d 1, 133 P.3d 1076] [quoting *Maury* with approval].)

On the other hand, we have also articulated the test this way: "To preserve a claim of trial court error in failing to remove a juror for bias in favor of the death penalty, a defendant must *either* exhaust all peremptory challenges and express dissatisfaction with the jury ultimately selected *or justify the failure to do so.*" (*People v. Williams* (1997) 16 Cal.4th 635, 667 [66 Cal.Rptr.2d 573, 941 P.2d 752], italics added; see also *People v. Hoyos* (2007) 41 Cal.4th 872, 904 [63 Cal.Rptr.3d 1, 162 P.3d 528] [quoting *Williams* with approval]; *People v. Guerra* (2006) 37 Cal.4th 1067, 1099 [40 Cal.Rptr.3d 118, 129 P.3d 321] [same].)

The difference is subtle. Does the justification option excuse the failure to exhaust one's peremptory challenges, the failure to express dissatisfaction with the jury, or both? As the majority implicitly recognizes, we need not resolve the point in this case, because defendant neither stated he was dissatisfied with the jury nor attempted to justify that failure. Counsel in future cases who wish to raise this issue on appeal, however, should be aware of this potential inconsistency in the law and ensure that they (1) remove the

prospective juror using a peremptory challenge, (2) exhaust their allotted challenges, and (3) express on the record their dissatisfaction with the jury as constituted. Only then can they be confident the issue will be properly preserved for appellate review.

With that caveat, I concur.

Appellant's petition for a rehearing was denied June 11, 2008.