Filed 2/11/15  P. v. Cole CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B253755 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA126093) |
| v. | |
| LONNY COLE, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of the County of Los Angeles, Kelvin D. Filer, Judge.  Affirmed, in part, and remanded with directions.

Matthew Alger, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Lance E. Winters, Senior Assistant Attorney General, Steven D. Matthews, Supervising Deputy Attorney General, David E. Madeo, Deputy Attorney General, for Plaintiff and Respondent.

# INTRODUCTION

A jury found defendant and appellant Lonny Cole (defendant) guilty of second degree murder and two counts of assault with a firearm.  On appeal, defendant contends that the trial court abused its discretion when it excused a juror and admitted evidence of defendant's prior acts of domestic violence.  Defendant further contends that the trial court erred when it failed to instruct the jury sua sponte on the lesser included offense of involuntary manslaughter and when it imposed a 10-year gang enhancement term on his sentence on count 1, instead of a 15-year minimum parole eligibility term.

We hold that the trial court did not abuse its discretion in excusing the juror or in admitting defendant's prior acts of domestic violence.  We further hold that there was insufficient evidence to support an instruction on involuntary manslaughter and that the trial court should have imposed a 15-year minimum parole eligibility term on defendant's sentence on count 1, instead of the 10-year gang enhancement that it did impose on count 1.  We therefore affirm the judgment of conviction and remand the matter with directions to the trial court to strike the 10-year gang enhancement term, impose instead a 15-year minimum parole eligibility term, and exercise its discretion to resentence defendant.

# FACTUAL BACKGROUND

## A.    Prosecution's Case

Andrea Harris[1] knew Iyonhia Stafford (the victim) for about a year prior to the victim's death.  On December 6, 2012, Harris attended Eugene Poats's funeral.  Poats had been a member of the Broadway Gangster Crips gang.  Among other people, Darnesha Hardmen was with Harris at the funeral.  Members of the Broadway Gangster Crips were

---

[1]    Harris was reluctant to testify at trial because she did not want to be considered a "snitch," i.e. a person who tells "on somebody."

also in attendance at the funeral. After the funeral, Harris attended a repass[2] near Figueroa Street and Florence Avenue. Following the first repass, Harris attended a second one at 239 West 108th Street. It was held at a dance studio that had a dance floor and a bar. Harris saw defendant's girlfriend, Starletta Coffee, at the first and second repasses.

At around 12:30 p.m., Harris left the second repass and walked to her cousin's car which was parked "towards the corner." As Harris walked toward the car, Hardmen, who was sitting in a car, asked her for a cigarette. Harris had only one cigarette left, so she offered to share it with Hardmen. Harris entered the car in which Hardmen and four other women were seated. She entered through the driver's side rear-passenger door and sat behind Hardmen, the driver, and next to the victim. A woman Harris did not know sat on the other side of the victim, and Coffee sat next to that woman, closest to the passenger-side rear door. The backseat of the car was "crammed," and Harris did not have "a lot of room to move around."

Harris lit a cigarette while every one in the backseat drank alcohol. After a few minutes, "somebody came to the passenger back door [where Coffee was seated] banging on the window." From where she was seated, Harris could not see the face of the African-American man who had banged on the window. The man was wearing a blue shirt with a picture of Poats on it. The man banging on the window near Coffee said, "Open the door." Hardmen turned off the "child safety" lock and Coffee opened the door. Without saying anything, the man kicked Coffee in the face, and then pulled out a black gun and pointed it at Coffee in a downward direction. A second later, the gun discharged.

After the shooting, Harris saw the shooter walk away and then noticed that she had been shot. She felt "like fire, heat in [her] body" near her right side. After Harris realized she had been hit, she felt the victim leaning on her, so she "moved her

---

[2]    According to Harris, a repass was "where you go and eat and celebrate after the funeral."

3

off . . . and got out of the car without looking back." Harris began walking in the street toward Main Street and was "picked up" by her cousin. He drove her to a fire station at 108th Street and Main Street. She and her cousin exited the car and knocked on the fire station window. While they waited for someone to open the door to the station, the police arrived. Harris was placed in an ambulance, accompanied by a police officer, and began receiving treatment. While lying on the ambulance gurney, Harris received a cell phone call. A man asked if "Iyonhia," i.e., the victim, was "okay." The man identified himself as "Baby Noon."[3] Harris was surprised when the man asked about the victim because she was unaware that the victim had been hurt. The police officer then "grabbed [the phone] and hung it up." Harris's phone then rang again "back to back."

Once Harris arrived at the hospital, she received further medical treatment. While at the hospital, Harris learned that the victim had been shot. She was released the next day, but returned two weeks later to have a bullet removed from her right buttock.

Darnesha Hardmen was the victim's sister. She had known defendant for either eight or nine years, and they were "real good friends" because they grew up in the same neighborhood. Defendant told her he was a member of the "11 Deuce Broadway Crips" and was known by the moniker "Baby Noon."[4] He had been a member of that gang for as long as she had known him.

Hardmen knew that defendant was in a relationship with Coffee because defendant and Coffee had lived in her house in September 2012 during the late stage of Coffee's pregnancy with defendant's baby. During September 2012, Hardmen witnessed an incident of domestic violence between defendant and Coffee. She saw defendant slap and "sock" Coffee, who would deliver defendant's baby the next day. At a "Hood Day" celebration on November 2, 2012, Hardmen again saw defendant slap and "sock" Coffee

---

[3] Although Harris denied at trial knowing anyone named Baby Noon, she told an officer after the incident that she had known a person named Baby Noon for eight months.

[4] The victim's father, Antoine West, who had been recently murdered, was known as "Little Noon."

4

in the face. Coffee did not report either incident, and she did not terminate her relationship with defendant.

Although she was not a gang member, Hardmen associated with members of the Broadway Gangster Crips because she grew up in their territory and considered them family and friends. She considered defendant as a family member.

On December 6, 2012, Hardmen attended Poats's funeral. She went with the father of her baby, Douglas Johnson. Johnson had borrowed a black Dodge Charger from his cousin to drive to the funeral and the repasses. After attending the funeral and first repass, Hardmen went to a second repass at 239 West 108th Street. She and Johnson drove there in the Charger. The repass was held in a one-story studio with three rooms inside. Most of those in attendance at the second repass were members of the Broadway Gangster Crips, including her boyfriend Johnson.

At around 11:00 p.m., Hardmen witnessed an argument between defendant and Coffee.[5] Defendant told Coffee to leave the repass.[6] Hardmen left the studio with Tashanique Gilmore to purchase alcohol at a liquor store. After purchasing alcohol, the two women returned to the studio, but did not go back inside. Instead, they parked the Charger outside. She saw her sister, the victim, standing on the sidewalk. The victim entered the backseat of the car and, seconds later, Coffee also entered and sat in the backseat behind Gilmore who occupied the front passenger seat. A woman named Jaime sat next to Coffee, the victim sat next to Jaime, and Harris sat next to the victim behind the driver, Hardmen. Hardmen poured a cup of alcohol for her sister, the victim. Before Hardmen could give the cup to the victim, Coffee received a phone call, and Hardmen heard the caller say, "Bitch, where you at? Bitch, leave, Bitch. Where you at bitch? On Broadway, bitch, leave." Hardmen recognized the caller's voice as defendant's.

---

[5] At either the funeral or the studio, Hardmen heard defendant call Coffee a "snitch bitch" multiple times.

[6] Throughout the day, at Poats's funeral and the repasses, Hardmen saw defendant telling Coffee to leave, but she refused.

Defendant sounded, "[p]issed the fuck off." Coffee responded, "'I'm right here in the car. I'm right here outside."

After she heard Coffee's response, Hardmen saw defendant exit the studio with a gun. She tried to unlock the car door because she knew defendant, whom she referred to as Baby Noon. Defendant was carrying the gun in his right hand as he approached Hardmen's car. He walked to the passenger-side rear window where Coffee was seated, hit the gun on the window, and said, "Open the door." Hardmen tried unsuccessfully to unlock the door from the driver's seat. Defendant continued to bang on the window with the gun and said repeatedly, "Bitch, get out the car. Open the door." He also referred to his gang, saying, "On Broadway, open the door." As Hardmen continued to try to unlock the car door, defendant simultaneously pulled on the door handle which prevented the door from unlocking. Hardmen was trying to unlock the door because she did not think defendant would do anything to harm the women.

When Hardmen finally succeeded in unlocking the car, she saw the door near Coffee open and defendant kick towards Coffee's head. Two seconds later, defendant pointed the gun directly at Coffee and, a second later, shot her.[7] After the gunshot, the women panicked and exited the car; Hardmen was the last to leave. Before she exited, she looked back, but did not see any blood and, presumably, did not see the victim.[8] Once Hardmen exited the car, Harris approached her and said, "I'm hit." Hardmen did not see any blood on Harris, and she did not see her sister, the victim, anywhere on the street.

After Harris told Hardmen she had been shot, Hardmen ran and said, "Baby Noon shot [Harris]." As she ran, she saw defendant running toward Spring Street with Coffee.

---

[7] After the shooting, Coffee was treated for a gunshot wound to the left ring finger.

[8] Officers responding to the scene of the shooting found the victim lying in a gutter with her legs underneath a vehicle. One of the officers observed a gunshot wound under her right breast and an exit would on her left side near her kidney. The coroner concluded that the victim died as a result of that wound.

As he came to a parked white van, defendant turned around and came back. Hardmen came face to face with defendant in an alley near a trash bin. He approached Hardmen with the gun and said, "Take this." When Hardmen refused, defendant said, "Take it, cuz,[9] on Broadway." Hardmen again refused, saying, "No Baby Noon, I'm scared." Defendant had "a look in his eye like, bitch, take this gun," so Hardmen took it. After taking the gun from defendant, Hardmen threw it under a blue trash dumpster. She next saw defendant running by himself toward Main Street past the white van.

After Hardmen threw the gun, she went back to the studio and said, "'Baby Noon shot [Harris].' . . . 'The gun outside in a trash can.'" Because Hardmen did not know that her sister had been shot, Hardmen left with her boyfriend Johnson in the Charger. They drove to 111th Street and parked to wait for Hardmen's sister for an hour or two. Hardmen tried to call her sister by phone. Later that morning, Hardmen learned that her sister had been shot and she went directly to Harbor UCLA Medical Center. There she was informed that her sister had died and had been taken to the coroner's office.

At a subsequent court proceeding in this matter in May 2012, Hardmen was confronted by Coffee in a court hallway full of people. Coffee said, "'That's the snitch bitch right there. She's going to go tell.' [B]itch, I'm going to get you." Hardmen felt "like [her] life was over." According to Hardmen, "snitches die" because gang members do not approve of witnesses coming to court and telling the truth. Because she had agreed to testify, Hardmen had been relocated twice by the police department.

During an interview at the police station after the shooting, Hardmen was shown a photographic lineup. Hardmen identified defendant's photograph as the man who shot her sister.

Douglas Johnson was a former member of the Broadway Gangster Crips gang.[10] He had been a member for over half of his life. Johnson was a friend of defendant, who

---

[9]   According to Hardmen, "Cuz" meant Crip.

[10]   Johnson was reluctant to testify because he considered anyone who would do so as a snitch.

was a fellow Broadway Gangster Crip. He knew that defendant had been in a relationship with Coffee. He also knew the victim because she was the sister of Hardmen, who was the mother of his child.

On December 6, 2012, Johnson went to Poats's funeral with Hardmen. After the funeral, they attended both repasses. They arrived at the second repass at the studio around 10:00 p.m. in a black Charger. Johnson saw 50 or 60 people at the repass, many of whom were Broadway Gangster Crips. According to Johnson, defendant was not at the second repass and they had not spoken to each other "for a while prior to the funeral." Johnson recalls that many in attendance at the repass, including him, wore shirts with Poats's picture on them. He observed people changing out of the red and white suits that they had worn to the funeral into the shirts.

At some point, "people [began] fighting," and the women in attendance, including Hardmen, left the studio. Johnson did not hear or see a shooting outside, but someone came to the door and "said somebody got shot." Johnson went outside, saw "a lot of people . . . leaving," and an ambulance in the street. He saw Hardmen, who was shaking because she was frightened. She and Johnson left in the Charger because Johnson, who was on probation, was not supposed to be at the repass. They drove around looking for parties, but eventually returned to the area of the repass so Hardmen could look for her sister, the victim. They next stopped at 111th Street "for a while." Eventually, they returned to Johnson's house where he fell asleep, but Hardmen stayed up, concerned about her sister.

That morning, Hardmen received a call about her sister. Johnson drove Hardmen to the hospital where Hardmen learned that her sister had been shot. The following day, Hardmen told Johnson that his "homie," defendant, had shot her sister. Although Johnson denied it at trial, he told a detective after the shooting that Hardmen had told him that defendant gave her a gun after the shooting and she dropped it on the ground.[11]

---

[11]     The prosecution also introduced some evidence of monitored conversations while defendant was in jail, as well as gang evidence.

## B.     Defendant's Testimony

Defendant joined the Broadway Gangster Crips in 2003 when he was 14 years old. He joined because his friends had joined and he was just a follower. Defendant knew the victim who was the daughter of defendant's "big homie" or mentor, Antoine West—known as Little Noon. Defendant was very close with the victim and her sister, Hardmen, because they grew up together in the same "hood."

In December 2012, defendant was not on good terms with some of the other members of the Broadway Gangster Crips because his girlfriend, Coffee,[12] had testified as an uncooperative witness at the preliminary hearing and at the trial of Donta Kyle.[13] Defendant was afraid Coffee would be subject to discipline from the gang for testifying.

On the morning of December 6, 2012, defendant went to "the spot" on 111th Street to pick up a red and white tuxedo to wear as a pallbearer in Poats's funeral. Defendant then participated in Poats's funeral and went to a repass at a nightclub where "people [drank], ate, . . . danced and celebrated." Over 150 people attended the first repass, including people from different gangs. Coffee was with defendant throughout the day and he never told her to leave the first repass. He was, however, concerned about her safety.

At the second repass, defendant did ask Coffee to leave because "everyone was really intoxicated," "doing all sorts of drugs," and people were "arguing amongst each other." At some point, all the women were asked to leave because two gang members were about to fight and they did not want to fight "in front of people that weren't from the hood or from that area." Coffee left the repass with the other women. Within a minute or two, defendant "heard a shot go off. A gunshot." Everyone "got down," and then there was "a rush toward the door." As defendant was trying to exit the studio, he heard Coffee screaming outside. Defendant went out the door and ran "right into

---

[12]     Defendant denied that he had punched Coffee the day before she delivered his baby.

[13]     Kyle, a Broadway Gangster Crip, was on trial for the murder of Antoine West, or Little Noon.

9

[Coffee] almost." When defendant saw blood on Coffee's arm, he panicked and walked quickly with Coffee up the street. Defendant and Coffee went north on Spring Street to 109th Street where his car was parked. He drove Coffee to the Harbor UCLA Medical Center, took her inside so she could receive treatment, and then he left. Defendant went to his sister's house and fell asleep.

That morning, defendant received a call to pick up Coffee at the hospital. When he arrived at the hospital, defendant's car was surrounded by police cars. He was arrested and taken to the police station with Coffee.

## PROCEDURAL POSTURE

In an amended information, the Los Angeles County District Attorney charged defendant in count 1 with murder in violation of Penal Code section 187, subdivision (a)[14] and in counts 2 and 3 with assault within a firearm in violation of section 245, subdivision (a)(2). The District Attorney alleged as to count 1 that defendant personally discharged a firearm within the meaning of section 12022.53, subdivisions (b), (c), and (d). The District Attorney also alleged as to counts 2 and 3 that defendant personally discharged a firearm within the meaning of section 12022.5, subdivision (a). The District Attorney further alleged as to counts 1, 2, and 3 that those offenses were committed for the benefit of, at the direction of, and in association with a criminal street gang with the specific intent to promote, further, and assist in criminal conduct by gang members within the meaning of section 186.22, subdivision (b)(1)(C).

Following trial, the jury found defendant guilty on counts 1, 2, and 3. As to count 1, the jury found not true the gun use allegation under section 12022.53, subdivision (d). As to counts 2 and 3, the jury found true the gun use allegation under section 12022.5, subdivision (a).

---

[14]    All further statutory references are to the Penal Code, unless otherwise indicated.

10

The trial court sentenced defendant to an aggregate term of 25 years to life, comprised of a 15-years to life sentence on count 1, plus an additional, consecutive 10-year term pursuant to section 186.22, subdivision (b)(1)(C). The trial court also imposed, but stayed sentences on counts 2 and 3.

## DISCUSSION

### A.      Discharge of Juror No. 1

Defendant contends that the trial court abused its discretion when it discharged juror no. 1 prior to deliberations. According to defendant, the record of the discharge proceedings was insufficient to support the trial court's conclusion that juror no. 1 was incapable of performing her duties as a juror.

### *1.      Background*

On the first day of trial, juror no. 1 informed the trial court that she recognized a woman who was present in the courtroom observing the trial. "The Court: Now, my bailiff indicated you informed him that you thought you recognized one of the individuals in the audience; is that correct. [¶] Juror No. 1: Yes. [¶] The Court: And who is that? [¶] Juror No. 1: The lady with the blond hair. My mother has a store. So a lot of people are in and out of the store. [¶] The Court: What type of store. [¶] Juror No. 1: A grocery market. And I don't even know who that person is, but I think if *they see me— and I don't know how this is going to turn out*. [¶] The Court: Let me see if I can ease your fears. . . . It's my understanding the person you're talking about may be related to the victim who was killed. So that's why she's here, because she has an interest. I've been doing this since 1993, and I've done long cause, serious trials. And I have never ever heard of a juror having any problems, being threatened, because they sat on a case. And she's not affiliated with the defense. And this really isn't the typical type case. So I want to alleviate your concerns so you can continue as a juror. [¶] Juror No. 1: I really want to continue. [¶] The Court: The other thing is, I don't even know your name.

11

Nobody knows your name. And that information is sealed and remains sealed unless some other judge orders it be unsealed. So there's no way to find out your address or anything like that. [¶] Juror No. 1: I guess just because it's close by. [¶] The Court: Well, that's why we say not to pass by, but do you think you're okay? If you have any trepidation you can bring it to our attention. But I want to make sure you're not going to let it affect you. [¶] Juror No. 1. No, it won't. [¶] [Prosecutor]: Just so you know, she's never brought it to my attention that she knows you. I think she would say something like that, and I'm not going to bring it to her attention. But do you think that would sway you either way? [¶] Juror No. 1: No, it wouldn't. [¶] The Court: Anything else? [Prosecutor]: Just that—now that you know she's related to the murder victim, do you think that would affect you in deciding guilty or not guilty? [¶] Juror No. 1: I have no feelings either way. People associate me with my mother. She has that store. *It's kind of dangerous out here*. [¶] The Court: But we just wanted to calm those fears. And you'll hear me say at the end of the trial the specific information, all that information will be sealed and remain sealed until further order of this court. Now, don't share this with any other jurors. And if you feel different just tell the bailiff. [¶] Juror No. 1: All right."

Several days later, juror no. 1 again voiced concerns to the trial court, this time about being recognized in her neighborhood by someone and about her safety in general. "The Court: All right, we're at sidebar with juror number 1. Okay. Yes, what did you want to talk to us about? [¶] Juror No. 1: So yesterday as I was -- [¶] . . . [¶] Juror No. 1: So they seen me and I guess before this is pretty much my neck of the woods and I'm here a lot. *And I just don't want any problems*. I seen some—there was some commotion going on here between them out there, too, and it's just, you know, *I have to think about, you know, my safety, my family*. And another thing is this is my first time being a juror. And I like it. But at the end of the day and I think about it and just this past week someone recognized me in a shopping center and they referred to me, hey, aren't you Cookie's daughter. I kind of looked. A lot of people know my mom and from the neighborhood, especially, me, my mother and you know, I don't know. [¶] The

12

Court: No one has indicated that they know any of the jurors. The commotion that you heard, I can tell you that doesn't have anything to do with this case. The person was looking for someone else. [¶] Juror No. 1: It's just to be a familiar face and to be involved. [¶] The Court: We're at the homestretch. We're about to conclude the case in the next day or so. [¶] Juror No. 1: I understand. *It's just in the back of my mind*, it's not as—it's weird. It's not as if this is a different place and. [¶] The Court: It there anything that I could do to calm your fears? Because as I told you, I've been doing this a long time. I've never heard of any juror having any problem. If I tell you—in fact, I don't even know what your name is. No one knows your name. And even the name sheets that we were using, the attorneys, they don't even have them. They give them back afterwards and the clerk seals them up. At the end of the proceedings, you're going to hear me say I'm going to order all the juror information including names, addresses, telephone numbers and any information that even downstairs, all that information, I'm going to order it to be sealed and remain sealed until further order of this court. And if anybody were to ask me to unseal it, I would let you know so that you can come in and challenge it and say, no, I don't want to have that information unsealed. [¶] Juror No. 1: I understand that. It's just that to me, a familiar face, it seems to be because a lot of it I may remember faces, but not necessarily their name. [¶] The Court: What do you think you saw? [¶] Juror No. 1: I guess my mom, there's a church directly across the street. I don't know if they've come before or if they've been at that church, but it's been in the neighborhood. And she's right there on 107th. But a lot of people, you know, are in and out of the area, are in the area a lot. I visit my mother, and you know, it's just dropping my three year old off there before court. I'm there a lot. And just this area, the area where the events that have transpired. [¶] The Court: Have you been able to sit and listen and follow testimony today? [¶] Juror No. 1: Yes. Yeah, I'm listening to everything. [¶] The Court: Would you be willing to give it a try and if it reaches the point where you can't seem to follow that you feel like it's just too much for you, I ask you to try and bring that to my attention. Would that be okay? [¶] Juror No. 1: I'll try, yeah. Okay, that's just, like I said, I saw a familiar face and I try not to look at the people

13

in the audience or look at. [¶] The Court: A lot of stuff that the audience, like I said, the young man who I believe that I was just dealing with is actually here for kind of like a, I would say, a love triangle but they were looking for someone else who was not [defendant]. [¶] Juror No. 1: Right. [¶] The Court: And so they thought that that person was going to be here today. That person was not here. But that person didn't know that they weren't even supposed to be looking. That's not my regular bailiff. I guess he didn't do it as smooth to where no one would know this. [¶] Juror No. 1: *That's just my concern.* [¶] The Court: And I'm not challenging you. I'm glad you bring it to my attention. But I just, I mean, you've put so much time and effort into it at this point. I really would like to see you continue if you could. Do you want to sleep on it? [¶] Juror No. 1: *If I sleep on it and in the morning, if I can't.* [¶] *The Court: If you still are feeling fearful, then I'm going to talk to counsel and consider releasing you because I don't want to put you through that stress because you've tried.* [¶] Juror No. 1: I have. [¶] The Court: I appreciate it." (Italics added.)

After the defense rested, the trial court held another side bar with juror no. 1 to inquire about her ability to serve. "The Court: I wanted to see how you're doing? I wanted to see if you can make it? [¶] Juror No. 1: Yeah. I made it. But if this wasn't my community things would be different. *I don't want to have to sit here.* [¶] The Court: Do you think it's going to affect your ability to give both sides a fair trial? Did anything happen today? [¶] Juror No. 1: Like, I can tell some people recognize me. [¶] The Court: You mean in the audience? [¶] Juror No. 1: Yeah. [¶] The Court: Do you know which one? [¶] Juror No. 1: I think his mom. [¶] The Court: Whose mom? [¶] Juror No. 1: The defendant's, the heavyset lady. [¶] The Court: I don't know who, have you ever seen these people before. [¶] Juror No. 1: Not personally, but *it's too close for comfort. I don't want to have to deal with them seeing me as a juror. And everybody coming in and out of the store. A lot of people that know my mom grew up in that area.* [¶] The Court: Either of the attorneys have any questions? [¶] [Defense Counsel]: So you're part of the community but it's important to get people from the community so

14

[defendant] can have a jury of his peers. Do you think the fear you have will affect your deliberations? [¶] Juror No. 1: It wouldn't affect my deliberations. I will deliberate based on the evidence. [¶] [Prosecutor]: Do you feel sympathy for him? [¶] Juror No. 1: No, just the whole – [¶] [Prosecution]: *Just scared?* *[¶]* *Juror No. 1: Yes, being involved. I don't know which way it's going to go. But just me being associated.* They'll say I know her from being a juror. [¶] The Court: And I appreciate your concern but I just never heard of that happening. [¶] [Defense Counsel]: Would it reassure you if the prosecutor and I, neither of us have heard of anybody recognizing you. [¶] Juror No. 1: Well, they're not going to go to you and say I recognize her. [¶] The Court: That's the first thing they would do. They would tell them. [¶] [Defense Counsel]: Did they make any indication to make you think – [¶] Juror No. 1: No gestures. *Just the looks.* [¶] The Court: Audience members, I don't think they even look at the jurors. I really don't. They're looking at the witnesses, trying to see what's going on. And we haven't had any issues on this case. I wish there was something I could do to reassure you. And we do provide you to be escorted to your cars after the verdict. [¶] Juror No. 1*: And that will be fine, but I can't be escorted through all my life.* And it sucks because I'm enjoying being here. [¶] The Court: Okay. Well, what you're telling us is that you can do it but you don't want to do it. [¶] Juror No. 1: Well, I know you say you never heard of it but there's a first time for everything. [¶] The Court: Why don't you step outside. Go back to the jury box. [¶] The Court: What do you guys think? [¶] [Defense Counsel]: I like that she's so conscientious and I think she would make a great juror. [¶] The Court: She's saying she can do it. [¶] [Prosecutor]: Yes. She's not saying it will interfere. If she did I think it would be clear. [¶] [Defense Counsel]: Yes. [¶] The Court: One of the things she'll realize is there's strength in numbers with the other jurors. So yes, let's keep her on. She's saying she can do it and I think she can. Okay. Juror Number 1, come back. All right. We're real cognizant of your concerns but we just want to encourage you to hang in there. The jury is going to start deliberating tomorrow. . . . So I'm going to ask you to hang in there. But if you feel like you can't deliberate then just bring that to our attention. So I want you to try. . . . But if you feel at any point in time

you can't do it then bring it to my attention.  Okay?  Because I think you can do it.  [¶] Juror No. 1:  I mean, I'm capable of doing it, but had it not been my area it wouldn't be a problem at all.  [¶]  The Court:  Come on back tomorrow.  Okay.  [¶]  Juror No. 1:  But at what point do I --  [¶]  The Court:  If you think you can't do it, bring it to our attention." (Italics added.)

The next day, the trial court held another side bar with juror no. 1 to check on her status.  "The Court:  Juror No. 1, why don't you come side bar.  I'm just going to ask you, how are you feeling today?  [¶]  Juror No. 1:  The same as yesterday.  [¶]  The Court:  And what is that?  [¶]  Juror No. 1:  *I still feel uneasy.*  [¶]  The Court:  Did anything happen since yesterday?  [¶]  The Court:  Yesterday you shared some concerns, but you also said you could deliberate and that you could consider the evidence and it wouldn't effect you.  And we appreciate that fact, but *we want to make sure you're going to be able to carry out your function as a juror.*  [¶]  Juror No. 1:  *I would rather not.*  [¶] The Court:  Why?  [¶]  Juror  No. 1:  Just being here in this community.  [¶]  The Court: As we're going through this process have you had difficulty sleeping or carrying out your other daily routine?  [¶]  Juror No. 1:  Not sleeping, but this morning I woke up with a headache.  [¶]  . . .  [¶]  The Court:  Why don't you go back to your seat for right now. All right.  I'll hear from counsel.  *I'm concerned about her.  She was emotional this morning.  I'm just concerned as to whether she's going to be able to follow my instructions.  I can just see her caving with the first vote just to get it over with.*  [¶] *[Prosecutor]:  I'm concerned about her too.  I've never seen her emotional like this, this morning.  It sounded like she was going to cry.*  [¶]  *The Court:  I agree.*  [Defense Counsel].  [¶]  [Defense Counsel]:  [You] just feel like she doesn't want to be here.  But when you asked her if she was having trouble sleeping she said no, she didn't have any trouble sleeping, but she woke up with the headache.  I woke up with a headache too this morning.  [¶]  The Court:  But I'll be very frank.  *I don't think this juror has given any sign she's one way or the other.  I just feel like she wants this to end and it bothered me that she was upset by someone just looking back at her.  And she ties that to this case which tells me she's letting things outside the courtroom affect her.  We have three*

16

*alternates and that's why we have alternates. I can just see her falling apart during deliberations. So I'm going to find good cause to excuse juror no. 1. . . .* [¶] The Court: And excusing the juror is going to be over the defense objection." (Italics added.)

Following that sidebar, the trial court excused juror no. 1.

## 2. *Legal Principles and Standard of Review*

"A trial court may discharge a juror at any time, including during deliberations, based on a showing of 'good cause' that the juror is 'unable to perform his or her duty.' (§ 1089.) 'When a court is informed of allegations which, if proven true, would constitute good cause for a juror's removal, a hearing is *required*.' (*People v. Barnwell* (2007) 41 Cal.4th 1038, 1051 [63 Cal.Rptr.3d 82, 162 P.3d 596] (*Barnwell*); see *People v. Farnam* (2002) 28 Cal.4th 107, 141 [121 Cal.Rptr.2d 106, 47 P.3d 988].) The ultimate decision to retain or to discharge a juror rests within the court's sound discretion. (*People v. Burgener* (2003) 29 Cal.4th 833, 878 [129 Cal.Rptr.2d 747, 62 P.3d 1].) [¶] 'We review a trial court's decision to discharge a juror under an abuse of discretion standard, and will uphold such decision if the record supports the juror's disqualification as a demonstrable reality.' (*People v. Wilson* (2008) 43 Cal.4th 1, 26 [73 Cal.Rptr.3d 620, 178 P.3d 1113].) 'The demonstrable reality test entails a more comprehensive and less deferential review' than is typical under the abuse of discretion standard. (*Barnwell*, *supra*, 41 Cal.4th at p. 1052.) 'It requires a showing that the court as trier of fact *did* rely on evidence that, in light of the entire record, supports its conclusion . . .' that the juror was unable to perform his or her duties. (*Ibid.*) Although a reviewing court will not reweigh the evidence, we 'must be confident that the trial court's conclusion is manifestly supported by evidence on which the court actually relied.' (*Id.* at p. 1053.) In reaching that conclusion, we 'will consider not just the evidence itself, but also the record of reasons the court provides.' (*Ibid.*)" (*People v. Debose* (2014) 59 Cal.4th 177, 200-201.) A juror's fear of a defendant has been held insufficient to justify a discharge of the juror, in situations when there was other evidence in the record supporting an inference that the

17

juror could nevertheless perform his or her duties.  (*People v. Manibusan* (2013) 58 Cal.4th 40, 56; *People v. Navarette* (2003) 30 Cal.4th 458, 499-500.)

### 3.    Analysis

Defendant argues that fear alone does not justify the discharge of a juror and that the record in this case, at best, demonstrates that juror no. 1 was fearful.  The record does not, according to defendant, contain sufficient evidence that the juror's fear rendered her incapable of performing her duties as a juror.

Based on our review of the extensive record of the discharge proceedings, we conclude that the trial court acted within its broad discretion in discharging juror no. 1. From the beginning of trial, juror no. 1 was candid about her concerns, including that members of the victim's family may have recognized her because she lived in the neighborhood where the shooting occurred and where her mother had a grocery store. Although she agreed to continue to serve, she repeatedly raised concerns about her safety with the trial court.  Moreover, as the trial court observed, juror no. 1 became progressively more distressed as the trial proceeded.  Despite the juror's concerns, the trial court consistently endeavored to reassure her and repeatedly encouraged her to continue her service.  But, on the day juror no. 1 was discharged just before deliberations began, the trial court observed that she was extremely upset and distracted by matters unrelated to the trial itself.  The extent of her distress on that day ultimately convinced the trial court that she would be unable to follow its instructions and that she would "cav[e in] with the first vote to get it over with."

Because the trial court was in the best position to observe the conduct and demeanor of the juror in question, and because the court had the opportunity to observe her throughout the course of the trial, we cannot, under the governing standard of review, substitute our judgment for that of the trial court's.  Instead, we must defer to the trial court's determination concerning the juror's ability to perform adequately her duties as a juror so long as we are confident that its conclusion is manifestly supported by the evidence on which the trial court relied.  As noted, the trial court's conclusion was amply

18

supported by the record, which demonstrates that the juror's discharge was justified. Because the trial court did not act in an arbitrary, capricious, or patently absurd manner in discharging the juror, no abuse of discretion has been shown as to this issue.

### B.   Evidence of Prior Domestic Violence Incidents

Defendant contends that the trial court abused its discretion when it admitted evidence of certain prior acts of domestic violence that defendant committed against Coffee. According to defendant, the acts in issue were dissimilar to the shooting incident and, at best, showed that defendant may have had a propensity for domestic violence, but not for engaging in potentially lethal acts of gang discipline, such as murder.

#### 1.   Background

After overruling defendant's objection at an Evidence Code section 402 hearing, the trial court admitted testimony from Hardmen that, on two occasions in the months preceding the shooting, defendant slapped and "socked" Coffee. The first occasion took place the day before Coffee delivered defendant's child and the second was at a "Hood Day" celebration just weeks before the shooting, and it occurred in front of a crowd of people. The trial court admitted the evidence under Evidence Code section 1109 to show that defendant had the propensity to commit domestic violence against Coffee. The trial court also admitted it under Evidence Code section 1101 to show that defendant had the intent, motive, and opportunity to commit the charged crimes.

#### 2.   Legal Principles and Standard of Review

"Evidence Code section 1109 allows the introduction of evidence of [a] defendant's commission of prior acts of domestic violence in a criminal action charging [the] defendant with an offense involving domestic violence." (*People v. Poplar* (1999) 70 Cal.App.4th 1129, 1138.) Subdivision (a)(1) of Evidence Code section 1109 provides in pertinent part, "[I]n a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic

19

violence is not made inadmissible by [Evidence Code] Section 1101 if the evidence is not inadmissible pursuant to [Evidence Code] Section 352." Evidence Code section 1109 creates an exception to the general rule in Evidence Code section 1101, subdivision (a) that precludes admission of uncharged misconduct to show the defendant had a propensity to commit crimes. (Evid. Code, § 1109, subd. (a)(1); see also *People v. Johnson* (2000) 77 Cal.App.4th 410, 417.)

Under Evidence Code section 352, evidence is properly excluded if its probative value is "substantially outweighed" by the probability that its admission will necessitate undue consumption of time or create a substantial danger of undue prejudice, of confusing the issues, or of misleading the jury. (*People v. Cudjo* (1993) 6 Cal.4th 585, 609.) Therefore, a trial court has discretion to exclude evidence of prior acts of domestic violence if the probative value is substantially outweighed by the probability its admission would necessitate undue consumption of time or create a substantial danger of undue prejudice, of confusing the issues, or of misleading the jury. (Evid. Code, §§ 1109, subd. (a)(1), 352; *People v. Cudjo, supra,* 6 Cal.4th at p. 609.)

"The prejudice which exclusion of evidence under Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence. '[All] evidence which tends to prove guilt is prejudicial or damaging to the defendant's case. The stronger the evidence, the more it is "prejudicial." The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. In applying [Evidence Code] section 352, "prejudicial" is not synonymous with "damaging."'" (*People v. Karis* (1988) 46 Cal.3d 612, 638.)

A trial court's decision to admit evidence of prior acts of domestic violence as propensity evidence under Evidence Code sections 1109 and 352 is reviewed for an abuse of discretion. (*People v. Poplar, supra,* 70 Cal.App.4th at p. 1138.) "[T]he court's exercise of discretion will not be disturbed on appeal except upon a showing that it was

20

exercised in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice." (*People v. Brown* (2011) 192 Cal.App.4th 1222, 1233.)

"Evidence Code section 1101, subdivision (b), permits the admission of other-crimes evidence against a defendant 'when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident . . .) other than his or her disposition to commit such an act.' (See *People v. Catlin* (2001) 26 Cal.4th 81, 145 [109 Cal.Rptr.2d 31, 26 P.3d 357].) 'Section 1101 prohibits the admission of other-crimes evidence for the purpose of showing the defendant's bad character or criminal propensity.' (*Ibid*.) As with other circumstantial evidence, its admissibility depends on the materiality of the fact sought to be proved, the tendency of the prior crime to prove the material fact, and the existence or absence of some other rule requiring exclusion. (*People v. Roldan* (2005) 35 Cal.4th 646, 705 [27 Cal.Rptr.3d 360, 110 P.3d 289].) 'On appeal, the trial court's determination of this issue, being essentially a determination of relevance, is reviewed for abuse of discretion.' (*People v. Kipp* (1998) 18 Cal.4th 349, 369 [75 Cal.Rptr.2d 716, 956 P.2d 1169].)" (*People v. Whisenhunt* (2008) 44 Cal.4th 174, 203.)

### 3. *Analysis*

In this case, defendant was charged with offenses—murder and assault with a deadly weapon—that involved an act of domestic violence—i.e., an enraged defendant kicking his girlfriend in the face in retaliation for her refusal to comply with his demands to leave the funeral and repasses. Under Evidence Code section 1109, the evidence of defendant's prior acts of domestic violence was therefore admissible to show that the defendant had a propensity to commit such crimes, so long as its admission qualified under Evidence Code section 352.

Here, defendant denied kicking Coffee after he opened the car door and he also denied ever physically abusing her. Thus, the evidence that defendant had twice in the recent past punched Coffee in the face because he was upset with her was relevant to and highly probative of the disputed fact that, on the night of the shooting, he kicked her in

the face because he was upset with her refusing to leave the funeral and the repasses. Regardless of the reason, that act was domestic violence. That the prior incidents occurred within close proximity in time to the kicking incident also heightened the evidence's probative value. Thus, the trial court did not abuse its discretion in admitting evidence of the two prior acts of domestic violence under Evidence Code sections 1109 and 352.

The strong similarity between the two prior incidents and the kicking incident on the night of the shooting also qualified those prior acts for admission under Evidence Code section 1101, subdivision (b) to show intent, common plan, and identity. That similarity was sufficient to support an inference that defendant likely harbored the same intent and common plan in each instance, i.e., to inflict physical injury on Coffee for engaging in conduct that angered or upset defendant. The two prior incidents were also relevant to and highly probative of another issue in dispute, i.e., the identity of the shooter, because they had a tendency in reason to show that the unidentified African-American male who Harris saw kick Coffee in the face was Coffee's abusive boyfriend, defendant. Therefore, the trial court did not abuse its discretion in admitting evidence of the prior incidents under Evidence Code section 1101, subdivision (b).

### C. Failure to Instruct on Lesser Included Offense of Involuntary Manslaughter

Defendant contends that the trial court erred by refusing to instruct the jury on involuntary manslaughter as a lesser included offense of murder. He argues that there was sufficient evidence from which a jury could have concluded that defendant did not intend to shoot Coffee, but rather only intended to intimidate her.

#### 1. Background

Defendant's counsel requested that the trial court instruct the jury with CALCRIM No. 580—which defines the elements of involuntary manslaughter—as a lesser included

offense of murder because there was evidence that defendant merely "brandished"[15] the handgun which accidentally discharged. The trial court refused to give that instruction because it found that there was no evidence that the shooter merely brandished the gun.

## 2. Legal Principles and Standard of Review

"'""""[I]t is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. [Citations.] The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case." [Citation.] That obligation has been held to include giving instructions on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present [citation], but not when there is no evidence that the offense was less than that charged. [Citations.]'"" (*People v. Valdez* (2004) 32 Cal.4th 73, 115 [8 Cal.Rptr.3d 271, 82 P.3d 296] (*Valdez*).)" (*People v. Banks* (2014) 59 Cal.4th 1113, 1159 (*Banks*).)

"The rule that juries must be instructed on lesser included offenses '"prevents either party, whether by design or inadvertence, from forcing an all-or-nothing choice between conviction of the stated offense on the one hand, or complete acquittal on the other. Hence, the rule encourages a verdict, within the charge chosen by the prosecution, that is neither 'harsher [n]or more lenient than the evidence merits.'"" (*People v. Smith* (2013) 57 Cal.4th 232, 239-240 [159 Cal.Rptr.3d 57, 303 P.3d 368] (*Smith*).) Because instructing on lesser included offenses serves to increase the accuracy of verdicts, the requirement to do so applies '"even when as a matter of trial tactics a defendant not only fails to request the instruction but expressly objects to its being given." [Citation.]' (*Valdez*, *supra*, 32 Cal.4th at p. 115.)" (*Banks, supra*, 59 Cal.4th at pp. 1159-1160.)

---

**15** Section 417, subdivision (a)(2) provides in pertinent part, "Every person who, except in self-defense, in the presence of any other person, draws or exhibits any firearm, whether loaded or unloaded, in a rude, angry, or threatening manner, or who in any manner, unlawfully uses a firearm in any fight or quarrel is punishable as follows: . . . ."

23

"Generally, involuntary manslaughter is a lesser offense included within the offense of murder. (*People v. Prettyman* (1996) 14 Cal.4th 248, 274 [58 Cal.Rptr.2d 827, 926 P.2d 1013].) Due process requires that the jury be instructed on a lesser included offense *only* when the evidence warrants such an instruction. (*Hopper v. Evans* (1982) 456 U.S. 605, 611 [72 L.Ed.2d 367, 102 S.Ct. 2049]; *People v. Avena* (1996) 13 Cal.4th 394, 424 [53 Cal.Rptr.2d 301, 916 P.2d 1000]; *People v. Kaurish* [(1990)] 52 Cal.3d [648,] 696.)" (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1145.)

"On appeal, we review independently the question whether the trial court improperly failed to instruct on a lesser included offense.' (*People v. Souza* (2012) 54 Cal.4th 90, 113 [141 Cal.Rptr.3d 419, 277 P.3d 118] (*Souza*).) 'For purposes of determining a trial court's instructional duties, we have said that "a lesser offense is necessarily included in a greater offense if either the statutory elements of the greater offense, *or the facts actually alleged in the accusatory pleading*, include all the elements of the lesser offense, such that the greater cannot be committed without also committing the lesser."' (*Smith*, *supra*, 57 Cal.4th at p. 240, italics added.)" (*Banks, supra*, 59 Cal.4th at p. 1160.)

### 3. *Analysis*

To support his assertion that there was substantial evidence to support a finding that he merely brandished the handgun, without intending to fire it, and that it discharged accidentally, defendant points to the relatively minor gunshot wound to Coffee's ring finger, the evidence that Coffee voluntarily accompanied him to the hospital after the shooting, and the evidence showing Hardmen's bias against defendant and her intoxication on the night of the incident. Contrary to defendant's assertion, the foregoing evidence was insufficient to support a finding that defendant was merely brandishing the handgun with no intention of firing it.

Harris testified that the shooter pointed the handgun directly at Coffee after kicking her in the face and that the gun discharged immediately after he pointed it. Hardmen also testified that, after defendant kicked Coffee in the face, she saw defendant

24

point the gun directly at Coffee and, a second later, the gun discharged. Harris and Hardmen were the only witnesses who testified about the manner in which the shooter produced and discharged the handgun, and their testimony did not support a reasonable inference that the shooter merely brandished the gun with no intent to fire it. Both testified that the shooter aimed the gun at Coffee at point blank range and that he fired the gun almost immediately thereafter, evidence that strongly suggested that the shooter intended to shoot Coffee. Moreover, neither Harris nor Hardmen provided any testimony that would suggest that defendant merely drew or exhibited the handgun; and because defendant denied being the shooter, his testimony could not and did not support an inference that he merely brandished the handgun. Therefore, the testimony of the only two eyewitnesses to the shooting could not have supported a finding that the shooter intended to brandish, but not discharge the gun. Furthermore, defendant did not offer evidence of brandishing a weapon. He denied holding or firing the weapon.

In addition, the evidence of Coffee's minor wound and that she voluntarily accompanied defendant to the hospital did not contradict the eyewitness accounts of either Harris or Hardmen, nor was it sufficient by itself to support a reasonable inference that defendant did not intend to shoot Coffee. Although surveillance video from the hospital showed Coffee enter the facility with defendant, there was nothing in the record to suggest she did so voluntarily, as claimed by defendant. Similarly, that Hardmen may have been biased against defendant and intoxicated on the night of the incident did not suggest or imply that defendant merely intended to brandish his handgun, but not discharge it. At best, that was impeachment evidence—going to the credibility and weight of Hardmen's testimony—which did not and could not demonstrate affirmatively defendant's state of mind during the shooting. Thus, there was insufficient evidence to support a jury instruction on involuntary manslaughter.

### D. Gang Enhancement

Defendant argues that the trial court erred when it imposed under section 186.22, subdivision (b)(1)(C), an additional 10-year gang enhancement term on his 15-years-to-

life sentence on count 1.  According to defendant, section 186.22, subdivision (b)(1)(C) does not apply if the violent felony is punishable by imprisonment for life; instead, section 186.22, subdivision (b)(5) applies and requires the trial court to impose a minimum term of 15 years before the defendant may be considered for parole.  (*People v. Lopez* (2005) 34 Cal.4th 1002, 1004.)  The Attorney General agrees with defendant.

Based on the authorities cited above, we agree with the parties that the 10-year gang enhancement term in section 186.22, subdivision (b)(1)(C) does not apply to defendant's life sentence on count 1 and that the 15-year minimum parole eligibility term in section 186.22, subdivision (b)(5) applies instead.  We therefore remand the matter with directions to strike the 10-year gang enhancement term and to impose instead a 15-year minimum parole eligibility term on count 1.

The Attorney General contends that because the trial court imposed but stayed sentence on counts 2 and 3, the trial court should be directed on remand to exercise its sentencing discretion as to whether to impose and stay sentencing on counts 2 and 3.  (*People v. Burbine* (2003) 106 Cal.App.4th 1250, 1258.)  We agree and therefore further direct the trial court on remand for resentencing to consider the entire sentencing scheme.

## DISPOSITION

The judgment of conviction is affirmed and the matter is remanded to the trial court with directions to strike the 10-year gang enhancement term imposed on count 1 under section 186.22, subdivision (b)(1)(C), impose instead a 15-year minimum parole term under section 186.22, subdivision (b)(5), and exercise its sentencing discretion as to whether to impose and stay sentencing on counts 2 and 3.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

MOSK, Acting P. J.

We concur:

KRIEGLER, J.

GOODMAN, J.[*]

---

[*]     Judge of the Superior Court of the County of Los Angeles, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.