Filed 2/4/16  P. v. Castaneda CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>ISAAC SCOTT CASTANEDA,<br><br>    Defendant and Appellant. | F069066<br><br>(Super. Ct. No. 12CM1522)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Kings County.  Thomas DeSantos, Judge.

Victoria H. Stafford, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Kathleen A. McKenna and William K. Kim, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Isaac Scott Castaneda was convicted by a jury of attempted murder and possession of a firearm by a felon. The jury also found true the allegations, in connection with the attempted murder charge, that Castaneda personally used and intentionally discharged a firearm, as well as the allegation that he committed both the attempted murder and firearm possession offenses for the benefit of a gang. He contends the trial court committed prejudicial error by failing to instruct the jury on attempted voluntary manslaughter, a lesser included offense of attempted murder, based on the imperfect self-defense doctrine. We are not persuaded because there was no basis for the court to instruct the jury on attempted voluntary manslaughter. Accordingly, the judgment is affirmed.

## *PROCEDURAL HISTORY*

Castaneda was charged by information with attempted premeditated murder and possession of a firearm by a felon, in counts 1 and 2 respectively. (Pen. Code,[1] §§ 664/187, subd. (a), 29800, subd. (a)(1).) The information also alleged, as to count 1, that Castaneda personally used and intentionally discharged a firearm. (§ 12022.53, subds. (b) & (c).) The information further alleged, as to both counts, that Castaneda committed the offenses for the benefit of, at the direction of, or in association with a criminal street gang (§ 186.22, subd. (b)(1)), and that he had suffered two prior serious or violent felony convictions within the meaning of the Three Strikes law as well as two prior serious felony convictions within the meaning of the five-year serious-felony enhancement (§§ 667, subds. (a)(1), (b)–(i), 1170.12, subds. (a)–(d)).

The case proceeded to jury trial, and Castaneda was convicted on both counts. The jury also found the firearm and gang allegations to be true. In a bifurcated proceeding, Castaneda admitted he had two prior serious felony convictions. Castaneda was sentenced to an indeterminate term of 45 years to life in prison on count 1 and a

---

[1] All subsequent statutory references are to the Penal Code unless otherwise specified.

determinate term of 25 years on enhancements to count 1; on count 2, Castaneda was sentenced to a stayed term of six years in prison.

## FACTS

During the afternoon of April 27, 2012, in Lemoore, Andrew Otto was driving home in his turquoise Mustang after running errands, when he noticed that a black sports-utility vehicle (SUV), possibly an Expedition, was following him. The SUV had two occupants. Otto could not identify the driver but recognized the passenger as Castaneda, whom he knew very well.

Otto wanted to confirm that the SUV was following him, so he pulled into the parking lot of an auto parts store. The SUV pulled in behind him. Not wanting to have the SUV follow him home, Otto then drove to a liquor store. He got out of his car and went into the liquor store. He bought two bottles of water and a lottery scratcher. When Otto came out of the liquor store, he saw the black SUV parked in the store's lot. Otto got into his car and drove off. The black SUV continued to follow him.

Otto drove to his apartment complex and parked his car alongside the curb. The black SUV cruised slowly by, to the right of Otto's car, and then stopped. Otto walked along the sidewalk towards the SUV. Shrugging his shoulders and raising his hands with his palms open, he asked, "What's up?" Castaneda got out of the SUV on the passenger side, went around to the back of the SUV, pulled out a gun, and fired two shots at Otto. Otto took off running as a bullet grazed his arm; he heard another shot as he ran.

Officer Mark Pescatore, who was dispatched to the scene, viewed video recordings from the apartment complex's video surveillance system. The entire series of events that unfolded in front of the complex was captured on video, which showed Otto pulling up in his Mustang, followed by the black SUV; Otto walking over to the black SUV; a passenger exiting the SUV and two muzzle flashes emanating from the passenger's position behind the SUV; and Otto running away. Pescatore also detected what he termed as "bullet splash" on an exterior building wall behind the spot where Otto

3.

was standing at the time. The officer explained that "bullet splash" refers to localized damage to stucco at the point of impact of a bullet. In addition, Pescatore obtained video recordings from the video surveillance system of the liquor store where Otto had stopped; the video showed Otto leaving the store's parking lot followed by the black SUV.

Otto, who was 32 years old at the time of trial, testified that he had known Castaneda since the sixth grade; in fact, Castaneda used to be one of his best friends. Otto and Castaneda were members of the Brown Pride Norteños, a subset of the Norteño gang in the Lemoore area. Otto had been affiliated with the Brown Pride Norteños since he was 10 or 11 years old, and had vouched for Castaneda when the latter sought to join the gang. However, Otto and Castaneda grew apart in 2003, after Castaneda slept with the mother of Otto's children.

Also in 2003, Otto dropped out of the Norteños following 15 years of active participation in the gang and gang-related criminal activities. He dropped out in part because he completed a prison drug rehabilitation program with members of a rival gang. According to Otto, the Norteños deemed members who participated in prison programs with members of rival gangs to be "no good" and "[n]ot in good standing" within the gang. He also testified that the Norteños viewed dropouts as traitors. Indeed, Norteño members would attack dropouts so as to gain increased prestige within the gang.

Officer John Paul Henderson of the Hanford Police Department testified for the prosecution as an expert witness on criminal street gangs in Kings County. Henderson opined that Castaneda was a member of the Brown Pride Norteños, an aggressive and violent Norteño subset based in Lemoore. Henderson testified that Norteño affiliates engaged in robberies, drug sales, deadly weapon assaults, drive-by shootings, and murders. He also believed Otto was a Norteño dropout based on the fact that the California Department of Corrections had classified him as such and had placed him in the "sensitive needs yard" during his prison commitments. He explained that "dropouts

4.

[are] no longer welcomed in their gang" and would be killed in prison if not segregated into "sensitive needs yards."

Henderson testified about various aspects of Norteño culture. He stated the Norteño gang is governed by a set of rules known as the "14 bonds." The gang retaliates against members who break the bonds. Such retaliation ranges from assault to murder, but ultimately depends on "political" considerations such as the status of the offending gang member, with higher-status members suffering fewer consequences. Dropping out of the gang is a violation of the bonds and dropouts are considered enemies of the gang. Consequently, the gang authorizes its rank-and-file members to attack dropouts without obtaining advance permission from the gang's command structure as is required for other crimes committed on behalf of the gang.

Henderson explained that a gang member who shoots or kills a dropout gains respect and status in the gang. Gang members commit attacks on dropouts, members of rival gangs, and law enforcement personnel to advance themselves within the gang hierarchy: "Rival gangs, dropouts, and cops are three of the top things that are going to get [a gang member] the most respect and status within [the] gang. So if you get any one of those three, you could be a nobody, who can turn into a guy who may be calling shots within a certain time." Henderson believed that in attacking Otto, Castaneda was enforcing the bonds. More specifically, he explained, "when you become a gang member, you're told the rules and you're told you will assault dropouts … and he's just following the rules and being a good soldier."

On the day of the shooting, Otto was wearing black clothes, including a black T-shirt with the words, "Step your game up, get on my level." Henderson testified that while a dropout dressed in red clothing would draw the gang's attention because red is the color associated with Norteños historically, a dropout's choice of black clothing would not be particularly significant for the gang despite the fact that gang members sometimes wear black and white clothing to "throw law enforcement off." As for the

5.

words on Otto's shirt, Henderson testified that in his experience with gang members, he had "never seen that shirt or that wording," but he did not rule out the possibility that the words "could" have a gang-related meaning if the wearer was involved in a gang. Finally, Henderson agreed that Otto's words, "[w]hat's up," coupled with his open-palmed gesture, "could," depending on the context, be interpreted as an aggressive gesture.

Castaneda did not testify, nor did the defense call any other witnesses.

## *DISCUSSION*

### I.      *The trial court properly declined to instruct on imperfect self-defense*

At trial, in light of the attempted murder charge against Castaneda, the defense requested the court to instruct the jury on the lesser included offense of attempted voluntary manslaughter based on the theory that Castaneda acted in the heat of passion. Specifically, defense counsel argued as follows:

> "I believe that under the circumstances and the way the evidence came in, particularly I'm citing the video of the shooting, there are two reasonable interpretations of what occurred, and one is, of course, Count 1 is the People's charge, and then the lesser, and that is Mr. Otto moving towards the shooters in an aggressive manner, quickly and doing a hands up, "What's up?" phrase, which has a—is a confrontive expression on the streets, and that was testified to, and therefore this could be also construed as a heat of passion, for lack of [a better] word, or something that wasn't thought about, deliberated, a reaction, a quick reaction to a perceived assault or confrontation. And I will submit it on that."

The court noted that a defendant relying on heat of passion as a partial defense to the crime of attempted murder must show the presence of provocation *and* the heat of passion. The court denied the defense's request for an instruction on attempted voluntary manslaughter on the grounds there was insufficient evidence both of provocation and of Castaneda's state of mind.

In contrast to his argument to the trial court, Castaneda now contends that the trial court erred in failing sua sponte to instruct the jury on attempted voluntary manslaughter

6.

based on the imperfect self-defense doctrine, which applies when the defendant acts to kill another person because he """"*actually*, but unreasonably, believed he was in imminent danger of death or great bodily injury ….""" (*People v. Manriquez* (2005) 37 Cal.4th 547, 581.) The People respond that the court was not required to give such an instruction because "[t]here was no evidence from which a jury could reasonably infer that [Castaneda] had an *actual* belief that he was in imminent danger of being killed or suffering great bodily injury." We review de novo the question whether an instruction on a lesser included offense was warranted.[2] (*Ibid*.) We agree with the People that the court was not required to instruct the jury on attempted voluntary manslaughter.

A trial court is required sua sponte to instruct on a lesser included offense when there is substantial evidence from which a reasonable jury could conclude the defendant committed the lesser offense rather than the offense charged. (*People v. Breverman* (1998) 19 Cal.4th 142, 162.) Substantial evidence is "evidence that a reasonable jury would find persuasive" to show the defendant was guilty of the lesser offense. (*People v. Wilson* (2008) 43 Cal.4th 1, 16.) The court is not required to instruct the jury regarding the lesser offense when the evidence of its applicability is minimal or speculative. (*People v. Breverman*, *supra*, at p. 162 ["the existence of '*any* evidence, no matter how weak' will not justify instructions on a lesser included offense"]; *People v. Moye* (2009) 47 Cal.4th 537, 553; *People v. Gray* (2005) 37 Cal.4th 168, 219.)

Voluntary manslaughter is a lesser included offense of murder "when the requisite mental element of malice is negated by a sudden quarrel or heat of passion, or by an unreasonable but good faith belief in the necessity of self-defense. 'Only these circumstances negate malice when a defendant intends to kill.' [Citation.]" (*People v. Gutierrez* (2003) 112 Cal.App.4th 704, 708.) Similarly, attempted voluntary

---

[2] Castaneda also alleges that the trial court refused the requested instruction on improper grounds. However, since we review de novo the question whether the instruction was warranted, we need not address the details of the trial court's ruling.

manslaughter "is a lesser included offense of attempted murder" when the defendant acts without malice, i.e., in the heat of passion or based on an unreasonable but good faith belief in the necessity of self-defense. (*People v. Speight* (2014) 227 Cal.App.4th 1229, 1241; see *People v. McCoy* (2001) 25 Cal.4th 1111, 1116.)

The imperfect self-defense doctrine is narrow in scope. "It requires without exception that the defendant must have had an *actual* belief in the need for self-defense." (*In re Christian S.* (1994) 7 Cal.4th 768, 783.) Moreover, for the doctrine of imperfect self-defense to apply, "[t]he defendant's fear must be of *imminent* danger to life or great bodily injury. '"[T]he peril must appear to the defendant as immediate and present and not prospective or even in the near future. *An imminent peril is one that, from appearances, must be instantly dealt with.*" … [¶] This definition of imminence reflects the great value our society places on human life.' [Citation.] Put simply, the trier of fact must find an *actual* fear of an *imminent* harm." (*Ibid.*) "[W]hether the defendant actually held the required belief is to be determined by the trier of fact based on all the relevant facts." (*Ibid.*)

Here, the events leading up to the shooting were captured on video and the video was played in court for the jury. Otto also testified about the details of the shooting. Otto explained he remained some distance away from the SUV when he asked its occupants what was going on, i.e., he was on the sidewalk while the SUV was in the street. He testified he "put [his] hands up and ask[ed], 'What's up?'" and demonstrated for the jury the precise gesture he had made. The court described the gesture for the record as follows: "the witness basically threw his hands up, palms towards him and shrugged his shoulders at the same time." Otto stated he was simply asking a normal question and denied that the gesture had any special significance in "gang culture."

The evidence does not permit an inference that Otto's conduct was threatening under the circumstances. Otto had tried but failed to elude the SUV. When the SUV followed him home, he asked, from a distance, what was going on. His hands were open

and visible. There was no indication at the time, or subsequently, that he was armed. Castaneda and his companion could have driven away at any time; instead, Castaneda exited the SUV to take aim at Otto. Most importantly, there was no direct or circumstantial evidence to suggest that Castaneda actually believed he was in immediate peril on account of Otto's actions and, hence, had to shoot in self-defense. (See *People v. Wilson* (1992) 3 Cal.4th 926, 942 ["Speculation is an insufficient basis upon which to require the trial court to give an instruction on a lesser included offense."]; *People v. Manriquez*, *supra*, 37 Cal. 4th at p. 582 [imperfect self-defense instruction not warranted where the defendant was initial aggressor, there was no evidence that victim was armed, and the defendant never indicated he believed he was under imminent threat of death or great bodily injury].)

Castaneda argues that Henderson's opinion that Otto's gesture could, depending on the context, be interpreted as aggressive, supports an inference that Castaneda was afraid for his safety. Castaneda's argument is unpersuasive. Henderson's general and conditional statements do not constitute substantial evidence from which a reasonable jury could conclude that Castaneda was in *actual* fear of *imminent* harm. Castaneda also asserts that Otto had a grudge against him on account of his relationship in 2003 with the mother of Otto's children. He argues that this, along with other relevant facts, warrants an instruction to the jury on attempted voluntary manslaughter. However, the existence of such a grudge on Otto's part sheds no light on whether Castaneda actually believed he was in immediate peril.

In sum, the record does not disclose substantial evidence from which a reasonable jury could conclude that Castaneda shot at Otto because Castaneda actually believed he had to act in self-defense. Accordingly, the trial court did not err in failing sua sponte to instruct the jury on attempted voluntary manslaughter. We also reject Castaneda's assertion that the court's failure to give an attempted voluntary manslaughter instruction violated his constitutional rights. A trial court's failure to instruct on a lesser included

9.

offense does not violate a defendant's constitutional rights under the circumstances that apply here, "for no fundamental unfairness or loss of verdict reliability results from the lack of instructions on a lesser included offense that is unsupported by any evidence upon which a reasonable jury could rely." (See *People v. Holloway* (2004) 33 Cal.4th 96, 141.)

Furthermore, even assuming the trial court's failure to instruct on the imperfect self-defense doctrine was erroneous, the error was harmless under the *Watson* test, which applies to such instructional errors. (*People v. Moye*, *supra*, 47 Cal.4th at p. 555; *People v. Breverman*, *supra*, 19 Cal. 4th at 177–178; see *People v. Sakarias* (2000) 22 Cal.4th 596, 621 [failure to instruct regarding lesser included offense, when evidence in support of that offense "was, at best, extremely weak" did not constitute reversible error].) In convicting Castaneda of attempted murder, the jury credited Otto's account and the video evidence of the encounter. Since Castaneda did not testify or provide a basis for a different interpretation of events, it is not "reasonably probable" he would have obtained a more favorable outcome at trial had an imperfect self-defense instruction been given. (*People v. Watson* (1956) 46 Cal.2d 818, 836.)

## *DISPOSITION*

The judgment is affirmed.

_____
          KANE, J.

WE CONCUR:


_____
LEVY, Acting P.J.


_____
FRANSON, J.

10.